# NEW YORK CENTRAL RAILROAD COMPANY *v.* WINFIELD.

**ERROR TO THE SUPREME COURT, APPELLATE DIVISION, THIRD JUDICIAL DEPARTMENT, OF THE STATE OF NEW YORK.**

No. 321.  Argued February 29, March 1, 1916; restored to docket for reargument November 13, 1916; reargued February 1, 1917.—Decided May 21, 1917.

The liabilities and obligations of interstate railroad carriers to make compensation for personal injuries suffered by their employees while engaged in interstate commerce are regulated both inclusively and exclusively by the Federal Employers' Liability Act; and, Congress having thus fully covered the subject, no room exists for state regulation, even in respect of injuries occurring without fault, as to which the federal act provides no remedy.

Therefore, an award made under the New York Workmen's Compensation Act for injuries not attributable to negligence, which were received by an employee of an interstate railroad carrier while both were engaged in interstate commerce, cannot be upheld.

168 App. Div. 351; 216 N. Y. 284, reversed.

THE case is stated in the opinion.

*Mr. Frank V. Whiting* and *Mr. Robert E. Whalen*, with whom *Mr. H. Leroy Austin* and *Mr. William L. Visscher* were on the brief, for plaintiff in error.

*Mr. E. Clarence Aiken*, with whom *Mr. Egburt E. Woodbury*, Attorney General of the State of New York, and *Mr. Harold J. Hinman* were on the brief, for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

While in the service of a railroad company in the State of New York, James Winfield sustained a personal injury

whereby he lost the use of an eye. At that time the railroad company was engaging in interstate commerce as a common carrier and Winfield was employed by it in such commerce. The injury was not due to any fault or negligence of the carrier, or of any of its officers, agents or employees, but arose out of one of the ordinary risks of the work in which Winfield was engaged. He was a section laborer assisting in the repair of the carrier's main track and while tamping cross-ties struck a pebble which chanced to rebound and hit his eye. Following the injury he sought compensation therefor from the carrier under the Workmen's Compensation Law of the State [1] and an award was made to him by the state commission, one member dissenting. The carrier appealed and the award was affirmed by the Appellate Division of the Supreme Court, two judges dissenting, 168 App. Div. 351, and also by the Court of Appeals, 216 N. Y. 284. Before the commission and in the state courts the carrier insisted that its liability or obligation and the employee's right were governed exclusively by the Employers' Liability Act of Congress, c. 149, 35 Stat. 65; c. 143, 36 Stat. 291, and therefore that no award could be made under the law of the State. That insistence is renewed here.

It is settled that under the commerce clause of the Constitution Congress may regulate the obligation of common carriers and the rights of their employees arising out of injuries sustained by the latter where both are engaged in interstate commerce; and it also is settled that when Congress acts upon the subject all state laws covering the same field are necessarily superseded by reason of the supremacy of the national authority.[2] Congress acted

---

[1] See *New York Central R. R. Co.* v. *White*, 243 U. S. 188.

[2] *Second Employers' Liability Cases*, 223 U. S. 1, 53–55; *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Hesterly*, 228 U. S. 702; *St. Louis, San Francisco & Texas Ry. Co.* v. *Seale*, 229 U. S. 156; *Taylor* v. *Taylor*, 232 U. S. 363; *Chicago, Rock Island & Pacific Ry. Co.* v. *Devine*, 239

upon the subject in passing the Employers' Liability Act, and the extent to which that act covers the field is the point in controversy. By one side it is said that the act, although regulating the liability or obligation of the carrier and the right of the employee where the injury results in whole or in part from negligence attributable to the carrier, does not cover injuries occurring without such negligence, and therefore leaves that class of injuries to be dealt with by state laws; and by the other side it is said that the act covers both classes of injuries and is exclusive as to both. The state decisions upon the point are conflicting. The New York court in the present case and the New Jersey court in *Winfield* v. *Erie R. R. Co.*, 88 N. J. L. 619, hold that the act relates only to injuries resulting from negligence, while the California court in *Smith* v. *Industrial Accident Commission*, 26 Cal. App. 560, and the Illinois court in *Staley* v. *Illinois Central R. R. Co.*, 268 Illinois, 356, hold that it has a broader scope and makes negligence a test,—not of the applicability of the act, but of the carrier's duty or obligation to respond pecuniarily for the injury.

In our opinion the latter view is right and the other wrong. Whether and in what circumstances railroad companies engaging in interstate commerce shall be required to compensate their employees in such commerce for injuries sustained therein are matters in which the Nation as a whole is interested and there are weighty considerations why the controlling law should be uniform and not change at every state line. *Baltimore & Ohio R. R. Co.* v. *Baugh*, 149 U. S. 368, 378–379. It was largely in recognition of this that the Employers' Liability Act was enacted by Congress. *Second Employers' Liability Cases*, 223 U. S. 1, 51. It was drafted and passed shortly follow-

U. S. 52; *Texas & Pacific Ry. Co.* v. *Rigsby*, 241 U. S. 33, 41; *Northern Pacific Ry. Co.* v. *Washington*, 222 U. S. 370; *Erie R. R. Co.* v. *New York*, 233 U. S. 671; *Southern Ry. Co.* v. *Railroad Commission*, 236 U. S. 439.

ing a message from the President advocating an adequate
national law covering all such injuries and leaving to the
action of the several States only the injuries occurring
in intrastate employment. Cong. Rec., 60th Cong., 1st
sess., 1347. And the reports of the congressional com-
mittees having the bill in charge disclose, without any
uncertainty, that it was intended to be very comprehen-
sive, to withdraw all injuries to railroad employees in inter-
state commerce from the operation of varying state laws
and to apply to them a national law having a uniform
operation throughout all the States. House Report No.
1386 and Senate Report No. 460, 60th Cong., 1st sess.
Thus, in the House Report it is said: "It [the bill] is in-
tended in its scope to cover all commerce to which the
regulative power of Congress extends . . . by this
bill it is hoped to fix a uniform rule of liability throughout
the Union with reference to the liability of common car-
riers to their employees. . . . A Federal statute of
this character will supplant the numerous State statutes
on the subject so far as they relate to interstate commerce.
It will create uniformity throughout the Union, and the
legal status of such employer's liability for personal in-
juries instead of being subject to numerous rules will be
fixed by one rule in all the States."

True, the act does not require the carrier to respond for
injuries occurring where it is not chargeable with neg-
ligence, but this is because Congress, in its discretion,
acted upon the principle that compensation should be
exacted from the carrier where, and only where, the injury
results from negligence imputable to it. Every part of the
act conforms to this principle, and no part points to any
purpose to leave the States free to require compensation
where the act withholds it. By declaring in § 1 that the
carrier shall be liable in damages for an injury to the
employee "resulting in whole or in part from the negligence
of any of the officers, agents, or employees of such carrier,

or by reason of any defect or ·insufficiency, due to its negligence, in its cars, engines,· appliances, machinery, track," etc.,[1] the act plainly shows, as was expressly held in *Seaboard Air Line Ry.* v. *Horton,* 233 U. S. 492, 501, that it was the intention of Congress to make negligence the basis of the employee's right to damages,· and to exclude responsibility of the carrier to the employee for an injury not resulting from its negligence or that of its officers, agents or other·employees.   The same principle is seen also in § 3, which requires that where the carrier and the employee are both negligent the recovery shall be diminished in proportion to the employee's contribution to the total negligence, and in § 4, which regards in-juries arising. from risks assumed by the employee as among those for which the carrier should not be made to respond.   The committee reports upon the bill show that this principle was adopted· deliberately, notwithstanding there were those within and without the committees who looked· with greater favor upon a ,different principle which puts negligence out of view and regards the employee as entitled to compensation wherever the injury is an incident of the service in which he is employed.   A few years after the passage of the act a legislative commission drafted and the Committees on the Judiciary in the two houses of Congress favorably reported a bill substituting the latter principle for the other, Senate Report No.. 553, 62d Cong., 2d sess., House Report No. 1441, 62d Cong., 3d sess., but that bill did not become a law.

That the act is comprehensive and also exclusive is dis--tinctly recognized in repeated decisions of. this court. Thus, in *Missouri, Kansas & Texas Ry. Co.* v. *Wulf*, 226 U. S. 570, 576, and other cases, it is pointed out that the subject which the act covers is "the responsibility of

---

[1] The act is printed in full in *Second Employers' ·Liability Cases*, 223 U. S. 1,. 6–10.

interstate carriers by railroad to their employés injured in such commerce"; in *Michigan Central R. R. Co.* v. *Vreeland*, 227 U. S. 59, 66, 67, it is said that "we may not piece out this act of Congress by resorting to the local statutes of the State of procedure or that of the injury," that by it "Congress has undertaken to cover the subject of the liability of railroad companies to their employés injured while engaged in interstate commerce," and that it is "paramount and exclusive"; in *North Carolina R. R. Co.* v. *Zachary*, 232 U. S. 248, 256, it is held that where it appears that the injury occurred while the carrier was engaged and the employee employed in interstate commerce the federal act governs to the exclusion of the state law; in *Seaboard Air Line Ry.* v. *Horton, supra*, pp. 501, 503, it is said not only that Congress intended "to exclude responsibility of the carrier to its employés" in the absence of negligence, but that it is not conceivable that Congress "intended to permit the legislatures of the several States to determine the effect of contributory negligence and assumption of risk, by enacting statutes for the safety of employés, since this would in effect relegate to state control two of the essential factors that determine the responsibility of the employer;" and in *Wabash R. R. Co.* v. *Hayes*, 234 U. S. 86, 89, it is said: "Had the injury occurred in interstate commerce, as was alleged, the Federal act undoubtedly would have been controlling and a recovery could not have been had under the common or statute law of the State; in other words, the Federal act would have been exclusive in its operation, not merely cumulative [citing cases]. On the other hand, if the injury occurred outside of interstate commerce, the Federal act was without application and the law of the State was controlling."

The act is entitled, "An Act Relating to the liability of common carriers by railroad to their employees in certain cases," and the suggestion is made that the words "in

certain cases" require that the act be restrictively construed. But we think these words are intended to do no more than to bring the title into reasonable accord with the body of the act, which discloses in exact terms that it is not to embrace all cases of injury to the employees of such carriers, but only such as occur while the carrier is engaging and the employee is employed in "commerce between any of the several States," etc. See *Employers' Liability Cases*, 207 U. S. 463.

Only by disturbing the uniformity which the act is designed to secure and by departing from the principle which it is intended to enforce can the several States require such carriers to compensate their employees for injuries in interstate commerce occurring without negligence. But no State is at liberty thus to interfere with the operation of a law of Congress. As before indicated, it is a mistake to suppose that injuries occurring without negligence are not reached or affected by the act, for, as is said in *Prigg* v. *Pennsylvania*, 16 Pet. 539, 617, "if Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the state legislatures have a right to interfere, and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject-matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it." Thus the act is as comprehensive of injuries occurring without negligence, as to which class it impliedly excludes liability, as it is of those as to which it imposes liability. In other words, it is a regulation of the carriers' duty or obligation as to both. And the reasons which operate to prevent the

States from dispensing with compensation where the act requires it equally prevent them from requiring compensation where the act withholds or excludes it.

. It follows that in the present case the award under the state law cannot be sustained.

*Judgment reversed.*

MR. JUSTICE BRANDEIS, dissenting.

I dissent from the opinion of the court; and the importance of the question involved induces me to state the reasons.

By the Employers' Liability Act of April 22, 1908, Congress provided, in substance, that railroads engaged in interstate commerce shall be liable in damages for their negligence resulting in injury or death of employees while so engaged. The majority of the court now holds that by so doing Congress manifested its will to cover the whole field of compensation or relief for injuries suffered by railroad employees engaged in interstate commerce; or, at least, the whole field of obligation of carriers relating thereto; and that it thereby withdrew the subject wholly from the domain of state action. In other words the majority of the court declares, that Congress by passing the Employers' Liability Act prohibited States from including within the protection of their general Workmen's Compensation Laws employees who *without fault on the railroad's part* are injured or killed while engaged in interstate commerce; although Congress itself offered them no protection. That Congress *could* have done this is clear. The question presented is: Has Congress done so? Has Congress so willed?

The Workmen's Compensation Law of New York here in question has been declared by this court to be among those which "bear so close a relation to the protection of the lives and safety of those concerned that they properly

may be regarded as coming within the category of police regulations." *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 207. And this court has definitely formulated the rules which should govern in determining when a federal statute regulating commerce will be held to supersede state legislation in the exercise of the police power. These rules are:

1. "In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Sherlock* v. *Alling,* 93 U. S. 99, 103.

2. "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to regulation of Congress within the sphere of its delegated power. . . .

"But the intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State." *Savage* v. *Jones,* 225 U. S. 501, 533.

3. "The question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an act of Congress passed in the execution of a clear power under the Constitution, unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together." *Missouri, Kansas & Texas Ry. Co.* v. *Haber,* 169 U. S. 613, 623.

Guided by these rules and the cases in which they have

been applied [1] we endeavor to determine whether Congress in enacting the Employers' Liability Act intended

---

[1] The following cases show that Congress, in legislating upon a particular subject of interstate commerce, will not be held to have inhibited by implication the exercise by the States of their reserved police power, unless such state action would actually frustrate or impair the intended operation of the federal legislation.

1. In *Sligh* v. *Kirkwood*, 237 U. S. 52, 62, it was held that the Federal Food and Drugs Act, dealing, among other things with shipment in interstate commerce of fruit in filthy, decomposed, or putrid condition, did not prevent a State from penalizing the shipment of citrus fruits "which are immature or otherwise unfit for consumption."

2. In *Atlantic Coast Line R. R. Co.* v. *Georgia*, 234 U. S. 280, 293, it was held that Congress did not, by the passage of the Federal Safety Appliance Acts, dealing with the equipment of locomotives, as well as of cars, and the Act to Regulate Commerce, preclude the States from legislating concerning locomotive headlights, as to which Congress had not specifically acted.

3. In *Missouri, Kansas & Texas Ry. Co.* v. *Harris*, 234 U. S. 412, 420, it was held that the Carmack Amendment (34 Stat. 584, 595), regulating the carrier's liability for loss of interstate shipments, did not prevent a State from providing for the allowance of a moderate attorney's fee in a statute applicable both in the case of interstate and intrastate shipments.

4. In *Savage* v. *Jones*, 225 U. S. 501, 529, it was held that the passage by Congress of the Food and Drugs Act of 1906, which, among other things, prohibited misbranding, did not prevent the States from regulating the sale and requiring to be affixed a statement of ingredients and minimum percentage of fat and proteins.

5. In *Missouri Pacific Ry. Co.* v. *Larabee Flour Mills Co.*, 211 U. S. 612, 623, it was held that Congress, by granting, in the Act to Regulate Commerce, power to the Interstate Commerce Commission to compel equal switching service on cars destined to interstate commerce, did not, in the absence of the exercise by the Commission of its power, prohibit States from legislating on the subject.

6. In *Asbell* v. *Kansas*, 209 U. S. 251, 257, it was held that Congress, in providing that a certificate of inspection issued by the National Bureau of Animal Industry should entitle cattle to be shipped into any State without further inspection, did not prevent a State from penalizing the importation of cattle which had not been inspected either by the federal bureau or by designated state officials.

to prevent States from entering the specific field of compensation for injuries to employees arising *without fault*

---

7. In *Crossman* v. *Lurman*, 192 U. S. 189, 199, it was held that the Act of Congress of August 30, 1890, 26 Stat. 414, prohibiting importation into the United States of adulterated and unwholesome food, did not prevent the States from legislating for the prevention of the sale of articles of food so adulterated, as come within valid prohibitions of their statutes.

8. In *Reid* v. *Colorado*, 187 U. S. 137, 149, it was held that Congress, by making it an offence under the Animal Industry Act for anyone to send from State to State cattle known to be affected with communicable disease, did not prevent the States from penalizing the importation of cattle without inspection by designated state officials.

9. In *Missouri, Kansas & Texas Ry. Co.* v. *Haber*, 169 U. S. 613, 623, it was held that the Federal Animal Industry Act, making it a misdemeanor for any person or corporation to transport cattle known to be affected with contagious disease, did not prevent a State from imposing a civil liability for damages sustained by owners of domestic cattle by reason of the importation of such diseased cattle.

10. In *Smith* v. *Alabama*, 124 U. S. 465, 482, it was held that Congress did not, by the passage of the Act to Regulate Commerce, prohibit the States from enacting laws requiring persons to undergo examination before being permitted to act as locomotive engineers.

11. In *Sherlock* v. *Alling*, 93 U. S. 99, it was held that Congress did not, by the passage of many laws regulating navigation, with a view to safety, and providing for liability in certain cases, prohibit the application to an accident in navigable waters of a State of a statute providing for liability for wrongful death.

The following cases, holding that the Federal Employers' Liability Act supersedes the common or statutory laws of the States relating to the liability of railroads for negligent injuries to their employees while engaged in interstate commerce, are, of course, wholly consistent with the cases above referred to, the "field" of both federal and state laws there under consideration being identical: *Second Employers' Liability Cases*, 223 U. S. 1, 55; *Missouri, Kansas & Texas Ry. Co.* v. *Wulf*, 226 U. S. 570, 576; *Michigan Central R. R. Co.* v. *Vreeland*, 227 U. S. 59, 66; *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Hesterly*, 228 U. S. 702, 704; *St. Louis, San Francisco & Texas Ry. Co.* v. *Seale*, 229 U. S. 156; *Taylor* v. *Taylor*, 232 U. S. 363, 368; *Seaboard Air Line Ry.* v. *Horton*, 233 U. S. 492, 501; *Wabash R. R. Co.* v. *Hayes*, 234 U. S. 86, 89; *Toledo, St. Louis & Western R. R. Co.* v. *Slavin*, 236 U. S. 454, 458; *St.*

*on the railroad's part,* for which Congress made no provision.

To ascertain the intent we must look, of course, first at what Congress has said; then at the action it has taken, or omitted to take. We look at the words of the statute to see whether Congress has used any, which in terms express that will. We enquire whether, without the use of explicit words, that will is expressed in specific action taken. For Congress must be presumed to have intended the necessary consequences of its action. And if we find that its will is not expressed, or is not clearly expressed, either in words or by specific action, we should look at the circumstances under which the Employers' Liability Act was passed; look, on the one hand, at its origin, scope and purpose; and, on the other, at the nature, methods and means of state Workmen's Compensation Laws. If the will is not clearly expressed in words we must consider all these in order to determine what Congress intended.

*First*—As to words used: The act contains no words expressing a will by Congress to cover the whole field of compensation or relief for injuries received by or for death of such employees while engaged in interstate commerce; or the whole field of carriers' obligations in relation thereto. The language of the act, so far as it indicates anything in this respect, points to just the contrary. For its title is: "An Act Relating to the liability of common carriers by railroad to their employees in certain cases." [1]

---

*Louis, Iron Mountain & Southern Ry. Co.* v. *Craft,* 237 U. S. 648; *Chicago, Rock Island & Pacific Ry. Co.* v. *Devine,* 239 U. S. 52, 54; *Chicago, Rock Island & Pacific Ry. Co.* v. *Wright,* 239 U. S. 548, 551; *Seaboard Air Line Ry.* v. *Kenney,* 240 U. S. 489, 493; *Osborne* v. *Gray,* 241 U. S. 16, 19.

[1] The title of this act may be profitably compared with that of the bill (not enacted) prepared by the Employers' Liability and Workmen's Compensation Commission pursuant to Joint Resolution No. 41, approved June 25, 1910, 36 Stat. 884, proposing a Federal Workmen's Compensation Law, which reads: "A bill to provide an exclusive remedy

*Second*—As to specific action taken: The power exercised by Congress is not such that, when exercised, it *necessarily* excludes the state action here under consideration. It would obviously have been possible for Congress to provide in terms, that wherever such injuries or death result from the railroad's negligence, the remedy should be sought by action for damages; and wherever injury or death results from causes other than the railroad's negligence, compensation may be sought under the Workmen's Compensation Laws of the States. Between the federal and the state law there would be no conflict whatsoever. They would, on the contrary, be complementary.

*Third*—As to origin, purpose and scope of the Employers' Liability Act and the nature, methods and means of state Workmen's Compensation Laws: The facts are of common knowledge. Do they manifest that, by entering upon one section of the field of indemnity or relief for injuries or death suffered by employees engaged in interstate commerce, Congress purposed to occupy the whole field?

(A) *The origin of the Federal Employers' Liability Act:*

By the common law as administered in the several States, the employee, like every other member of the community, was expected to bear the risks necessarily attendant upon life and work; subject only to the right to be indemnified for any loss inflicted by wrongdoers. The employer, like every other member of the community, was in theory liable to all others for loss resulting from his wrongs; the scope of his liability for wrongs being amplified by the doctrine of *respondeat superior*. This legal liability, which in theory applied between employer and employee as well as between others, came, in course of

---

and compensation for accidental injuries resulting in disability or death, to employees of common carriers by railroad engaged in interstate or foreign commerce, or in the District of Columbia, and for other purposes." Sen. Doc. 338, p. 107, 62d Cong. 2d sess.

time, to be seriously impaired in practice. The protection it provided employees seemed to wane as the need for it grew. Three defenses—the doctrines of fellow servant's negligence, of assumption of risk and of contributory negligence—rose and flourished. When applied to huge organizations and hazardous occupations, as in railroading, they practically abolished the liability of employers to employees; and in so doing they worked great hardship and apparent injustice. The wrongs suffered were flagrant; the demand for redress insistent; and the efforts to secure remedial legislation widespread. But the opponents were alert, potent and securely entrenched. The evils of the fellow-servant rule as applied to railroads were recognized as early as 1856, when Georgia passed the first law abolishing the defense. Between the passage of that act and the passage of the first Federal Employers' Liability Act (Act of June 11, 1906, 34 Stat. 232), fifty years elapsed. In those fifty years only four more States had wholly abolished the defense of fellow servant's negligence. Furthermore, in only one State had a statute been passed making recovery possible, where the employee had been guilty of contributory negligence.[1] Meanwhile, the num-

---

[1] At the time the first Federal Employers' Liability Act was passed the so-called common law defenses remained in force, in large part, in most of the States, as to railroad employees.

A. *The Fellow Servant Rule.* (See Compilation of Statutes in "Liability of Employers," Senate Hearings, 1906, pp. 183–288; and in Senate Document No. 207, 60th Congress, 1st sess.)

(1) It had been completely abolished as to railroad employees in only 5 States: Georgia (1856), Kansas (1874), North Carolina (1897), Colorado (1901), North Dakota (1903).

(2) It remained in full force, or substantially so, in 25 States or Territories: Arizona, California, Connecticut, Delaware, Idaho, Illinois, Kentucky, Louisiana, Michigan, Maine, Maryland, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Tennessee, Vermont, Washington, West Virginia, Wyoming.

ber of accidents to railroad employees had become appalling. In the year 1905–6 the number killed while on duty was 3,807, and the number injured 55,524.[1] The promoters of remedial action, unable to overcome the efficient opposition presented in the legislatures of the several States, sought and secured the powerful support of the President.[2] Congress was appealed to and used its power

---

(3) In 16 other States it had been modified; abolished either as to certain more dangerous kinds of work, or as to certain classes of employees: Alabama, Arkansas, Florida, Indiana, Iowa, Massachusetts, Minnesota, Mississippi, Missouri, New York, Oregon, South Carolina, Texas, Utah, Virginia, Wisconsin.

(4) The passage of the first federal act immediately stimulated further state legislation. In 1907 the fellow-servant rule was abolished as to railroads in Arkansas, Nevada, Oklahoma, South Dakota; and largely in California, Nebraska, Pennsylvania and Wisconsin.

B. *Contributory Negligence.* (See compilations cited, *supra.*)

(1) In all but 1 State there had been no statutory change of the rule that contributory negligence constituted a complete defense. Georgia (1895) had substituted the comparative negligence doctrine. In Kansas and Illinois early cases at common law seeming to apply this doctrine had been repudiated. The common law of Tennessee also contained some traces of the doctrine.

(2) During the year following the passage of the first federal act, which adopted the rule of comparative negligence, with mitigation of damages proportionate to the degree of plaintiff's negligence, several States introduced this modification: Nebraska, Nevada, North Dakota, South Dakota, Wisconsin.

C. *Assumption of Risk.* (See the compilations cited, *supra.*)

The harshness of this rule had been mitigated by statute or other statutory action taken in only 14 States: Alabama, California, Colorado, Georgia, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Ohio, Oregon, South Carolina, Texas, Virginia. In 1907 Iowa abolished the rule as to employees giving notice of a known defect.

[1] See Report of Interstate Commerce Commission for the year 1906. Summary of Casualties, Table A, p. 161.

[2] President's Messages, December 2, 1902; December 6, 1904; December 5, 1905; January 31, 1908.

over interstate commerce to afford relief.   The promotion of safety was of course referred to in the Committee's report as justifying congressional action; but the moving cause for the Federal Employers' Liability Act was not the desire to promote safety or to secure uniformity, as in standardizing equipment by the Safety Appliance Acts.[1] There was, in the nature of things, no more reason for providing a federal remedy for negligent injury to employees than there would have been for providing such a remedy for negligent injury to passengers or to other members of the public.   The Federal Employers' Liability Act was, in a sense, emergency legislation.   The circumstances

---

[1] The following facts are significant as showing that employers' liability was not deemed a factor in safety to employees or the public, or a matter in which uniformity was desirable, or as otherwise presenting a railroad problem:

  (1) The Annual Reports of the Interstate Commerce Commission to Congress for the eleven years ending December, 1908, deal each year at large with accidents, casualties to employees, and the promotion of safety.   These reports contain numerous recommendations for legislation concerning safety appliances, hours of labor, block signals, train control, inspection and accident reporting; but no recommendation or even mention of employers' liability.

  (2) The National Convention of Railroad Commissioners, an association comprising the commissioners of the several States, is formed for the purpose of discussing and aiding in the solution of American railroad problems.   Likewise, in its reports for eleven years ending October, 1908, no reference has been found, either in the annual President's address, or in the report of the Committee on Legislation, or in the discussions, to the subject of employers' liability; or any mention of the passage by Congress of the two Employers' Liability Acts, or of the decision of this court on the first act.

  The absence of such reference is particularly noteworthy in the legislative report for the year 1908, pp. 218–233, which is devoted to a consideration of harmonious or uniform legislation.   It contains a résumé of the legislation in Congress recommended and supported by the National Convention of Railroad Commissioners during a period of 19 years and attendances at congressional hearings on safety appliances, block signal, and hours of labor legislation.

attending its passage were such as to preclude the belief that thereby Congress intended to deny to the States the power to provide for compensation or relief for injuries not covered by it.

(B) *The scope of the Federal Employers' Liability Act:*

(1.) The act leaves uncovered a large part of the injuries which result from the railroads' negligence. The decision of this court in the first *Employers' Liability Cases*, 207 U. S. 463, had declared that Congress lacked power to legislate in respect to any injuries occurring otherwise than to employees *engaged* in interstate commerce. Later decisions disclose how large a part of the injuries resulting from the railroads' negligence are thus excluded from the operation of the federal law. For the act was held to apply only to those *directly* engaged in interstate commerce. This excludes not only those engaged in intrastate commerce, but also the many who— while engaged on work *for* interstate commerce, as in repairing engines or cars—are not directly engaged *in* it. Likewise it excludes employees who, though habitually engaged directly in interstate commerce, *happen* to be injured or killed through the railroads' negligence, while performing some work in intrastate commerce.[1]

(2.) The act leaves uncovered all of the injuries which result *otherwise* than from the railroad's negligence, though occurring when the employee is engaged directly in interstate commerce.

The scope of the act is so narrow as to preclude the belief that thereby Congress intended to deny to the States

---

[1] Compare *Illinois Central R. R. Co.* v. *Behrens,* 233 U. S. 473; *New York Central & Hudson River R. R. Co.* v. *Carr,* 238 U. S. 260; *Delaware, Lackawanna & Western R. R. Co.* v. *Yurkonis,* 238 U. S. 439; *Shanks* v. *Delaware, Lackawanna & Western R. R. Co.,* 239 U. S. 556; *Chicago, Burlington & Quincy R. R. Co.* v. *Harrington,* 241 U. S. 177; *Erie R. R. Co.* v. *Welsh,* 242 U. S. 303; *Raymond* v. *Chicago, Milwaukee & St. Paul Ry. Co.,* 243 U. S. 43.

the power to provide compensation or relief for injuries not covered by it.

(C) *The purpose of the Employers' Liability Act:*

The facts showing the origin and scope of the act discussed above indicate also its purpose. It was to end the denial of the right to damages for injuries due to the railroads' negligence—a right denied under judicial decisions through the interposition of the defenses of fellow-servant, assumption of risk and contributory negligence. It was not the purpose of the act to deny to the States the power to grant *the wholly new right* to protection or relief in the case of injuries suffered otherwise than through fault of the railroads.

The Federal Employers' Liability Act was, in no respect, a departure from the individualistic basis of right and of liability. It was, on the contrary, an attempt to enforce truly and impartially the old conception of justice as between individuals. The common-law liability for fault was to be restored by removing the abuses which prevented its full and just operation. The liability of the employer, under the federal act as at common law, is merely a penalty for wrong doing. The remedy assured to the employee is merely a more efficient means of making the wrongdoer indemnify him whom he has wronged. This limited purpose of the Employers' Liability Act precludes the belief that Congress intended thereby to deny to the States the power to provide compensation or relief for injuries not covered by the act.

(D) *The nature of Workmen's Compensation Acts:*

In the effort to remove abuses, a study had been made of facts; and of the world's experience in dealing with industrial accidents. That study uncovered as fiction many an assumption upon which American judges and lawyers had rested comfortably. The conviction became widespread, that our individualistic conception of rights and liability no longer furnished an adequate basis for dealing

with accidents in industry. It was seen that no system of indemnity dependent upon fault on the employers' part could meet the situation; even if the law were perfected and its administration made exemplary. For in probably a majority of cases of injury there was no assignable fault; and in many more it must be impossible of proof. It was urged: Attention should be directed, not to the employer's fault, but to the employee's misfortune. Compensation should be general, not sporadic; certain, not conjectural; speedy, not delayed; definite as to amount and time of payment; and so distributed over long periods as to insure actual protection against lost or lessened earning capacity. To a system making such provision, and not to wasteful litigation, dependent for success upon the coincidence of fault and the ability to prove it, society, as well as the individual employee and his dependents, must look for adequate protection. Society needs such a protection as much as the individual; because ultimately society must bear the burden, financial and otherwise, of the heavy losses which accidents entail. And since accidents are a natural, and in part an inevitable, concomitant of industry as now practiced, society, which is served thereby, should in some way provide the protection. To attain this end, coöperative methods must be pursued; some form of insurance—that is, some form of taxation. Such was the contention which has generally prevailed. Thus out of the attempt to enforce individual justice, grew the attempt to do social justice. But when Congress passed the Employers' Liability Act of April 22, 1908, these truths had gained little recognition in the United States. Not one of the thirty-seven States or Territories which now have Workmen's Compensation Laws had introduced the system. Yet the conception and value of compensation laws was not unknown to Congress. It then had under consideration the first Compensation Law for Federal Employees which was enacted

in the following month (Act of May 30, 1908, 35 Stat. 556). The need of its speedy passage had been called to the attention of Congress by the President in the same special message which urged the passage of this Employers' Liability Act.

Can it be contended that Congress by simply passing the Employers' Liability Act prohibited the States from providing in *any* way for the maintenance of such employees (and their dependents) for whose injuries a railroad, innocent of all fault, could not be called upon to make indemnity under that act? It is the State which is both primarily and ultimately concerned with the care of the injured and of those dependent upon him; even though the accident may occur while the employee is engaged directly in interstate commerce. Upon the State falls the financial burden of dependency, if provision be not otherwise made. Upon the State falls directly the far heavier burden of the demoralization of its citizenry, and of the social unrest, which attend destitution and the denial of opportunity. Upon the State also rests under our dual system of government the duty owed to the individual to avert misery and promote happiness so far as possible. Surely we may not impute to Congress the will to deny to the States the power to perform either this duty to humanity or their fundamental duty of self-preservation. And if the States are left free to provide compensation, what is there in the Employers' Liability Act to show an intent on the part of Congress to deny to them the power to make the provision by raising the necessary contributions, in the first instance, through employers?

(E) *Methods and means of Workmen's Compensation Laws:*

The principle underlying Workmen's Compensation Laws is the same in all the States. The methods and means by which that principle is carried out vary materially. The principle is that of insurance, the premiums

to which are contributed by employers generally. How the insurance fund shall be raised and administered; what the scale of compensation or relief shall be; how the contributing groups of employers shall be formed; whether or not a state fund shall be created; whether the individual employer shall be permitted to become a self-insurer; whether he shall be permitted to deal directly with the employee in making settlement of the compensation to be awarded; on all these questions the laws of the several States do and properly may differ radically.

What methods and means the State shall adopt in order to provide compensation for injuries to citizens or residents where Congress has left it free to legislate, rests (subject to constitutional limitations) wholly within the judgment of the State. It might conclude, in view of the hazard involved, that no one should engage in the occupation of railroading without providing against the financial consequences of accidents through contributing an adequate amount to an accident insurance fund. It might conclude that it was wise to make itself the necessary contributions to such a fund, out of monies raised from general taxation. Or it might conclude, as the State of Washington did, that the fairest and wisest form of taxation for the purpose was to impose upon the employer directly the duty of making the required contributions—relying upon the laws of trade to effect, through the medium of transportation charges, an equitable distribution of the burden. The method last suggested is pursued in substance also by the State of New York. In its essence the laws of the States are the same in this respect, as is shown in *Mountain Timber Co.* v. *Washington,* 243 U. S. 219. It is misleading to speak of the new obligation of the employer to contribute to compensation for injuries to workmen as an increase of the "employer's liability." It is not a liability for a violation of a duty. It is a direct—a primary—obligation in the nature of a tax. And the right

of the employee is as free from any suggestion of wrong done to him as the new right granted by Mothers' Pension Laws.

(F) *Federal and State legislation are not in conflict.*

The practical difficulty of determining in a particular case, according to presence or absence of railroad fault, whether indemnity is to be sought under the Federal Employers' Liability Act or under a state compensation law—affords, of course, no reason for imputing to Congress the will to deny to the States power to afford relief through such a system. The difficulty and uncertainty is, at worst, no greater than that which now exists in so many cases where it is necessary to determine whether the employee was, at the time of the accident, engaged in interstate or intrastate commerce.[1] Expedients for minimizing inherent difficulties will doubtless be found by experience. All the difficulties may conceivably be overcome in practice. Or they may prove so great as to lead Congress to repeal the Federal Employers' Liability Act and leave to the States (which alone can deal comprehensively with it) the whole subject of indemnity and compensation for injuries to employees whether engaged in interstate or intrastate commerce, and whether such injuries arise from negligence or without fault of the employer.

We are admonished also by another weighty consideration not to impute to Congress the will to deny to the States this power. The subject of compensation for

---

[1] The number of cases on the October 1915 term of this court was 1069. Of these 93 involved one or more questions arising under the Federal Employers' Liability Act of April 22, 1908. Of these 93 cases, 37 presented the question whether or not the employee was engaged in *inter*state commerce or *intra*state commerce. In 52 of the cases the question was presented whether there was evidence of negligence on the part of defendant. In 24 of the cases the question was also presented whether or not the employee had assumed the risk.

accidents in industry is one peculiarly appropriate for state legislation. There must, necessarily, be great diversity in the conditions of living and in the needs of the injured and of his dependents, according to whether they reside in one or the other of our States and Territories, so widely extended. In a large majority of instances they reside in the State in which the accident occurs. Though the principle that compensation should be made, or relief given, is of universal application, the great diversity of conditions in the different sections of the United States may, in a wise application of the principle, call for differences between States, in the amount and method of compensation, the periods in which payment shall be made, and the methods and means by which the funds shall be raised and distributed. The field of compensation for injuries appears to be one in which uniformity is *not* desirable, or at least not essential to the public welfare.

The contention that Congress has, by legislating on one branch of a subject relative to interstate commerce, preëmpted the whole field—has been made often in this court; and, as the cases above cited show, has been repeatedly rejected in cases where the will of Congress to leave the balance of the field open to state action was far less clear than under the circumstances here considered. Tested by those decisions and by the rules which this court has framed for its guidance, I am of opinion, as was said in *Atlantic Coast Line R. R. Co. v. Georgia*, 234 U. S. 280, 294, that: "The intent to supersede the exercise of the State's police power with respect to this subject cannot be inferred from the restricted action which thus far has been taken." The field covered by Congress was a limited field of the carrier's liability for negligence, not the whole field of the carrier's obligation arising from accidents. I find no justification for imputing to Congress the will to deny to a large class of persons engaged in a necessarily

hazardous occupation [1] and otherwise unprovided for the protection afforded by beneficent statutes enacted in the long-deferred performance of an insistent duty and in a field peculiarly appropriate for state action.

MR. JUSTICE CLARKE concurs in this dissent.

---

[1] The experience of the organization [Brotherhood of Locomotive Firemen and Enginemen] shows that more than 60 per cent. of all deaths and disabilities are caused by railroad accidents.  W. S. Carter, Sen. Doc. 549, p. 137, 64th Cong. 1st sess.