No. 35,037

John O. Krouse, *Appellee*, v. Frank O. Lowden, James E. Gorman and Joseph B. Fleming, Trustees of the Estate of The Chicago, Rock Island & Pacific Railway Company, *Appellants*.

(109 P. 2d 138)

Opinion filed January 25, 1941.

*J. E. DuMars, Clayton M. Davis,* both of Topeka, *Edwin S. McAnany* and *Thomas M. Van Cleave,* both of Kansas City, for the appellants.

*Charles S. Schnider,* of Kansas City, *Cornelius Roach* and *D. L. Brenner,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

HOCH, J.: This proceeding was brought under the provisions of the Kansas workmen's compensation act. The claimant was a railroad employee. The railway company, respondent, appeals from a judgment of the district court confirming an award made by the Kansas workmen's compensation commissioner.

The principal contention urged by the appellants is that at the time of the accident the injured employee was engaged in interstate commerce within the purview of the federal employers' liability act, and that being within the provisions of the federal act the Kansas workmen's compensation commissioner had no jurisdiction in the matter. The appellants also contend that the award was arbitrary, excessive and unsupported by the evidence.

John O. Krouse had been employed by the Chicago, Rock Island and Pacific Railway Company for several years as an "engine herder." His duties were to look after switch engines in service, to keep the fire going, the steam pressure up, the tanks and boilers supplied with water, the engines oiled and cleaned—in short, to keep them in stand-by condition ready to be taken over by the operating crew. On the morning of April 17, 1938, he was performing his duties in connection with engine number 301 in the terminal yards of the company in Armourdale, Wyandotte county, Kansas, the engine having been placed on the track near a water crane for that purpose while awaiting the operating crew to take over. He had put water in the tank of the engine and had climbed down to the cab. He then started to come down the steps of the locomotive when he slipped, fell to the ground and fractured the heel bone of his left foot. The injury required medical and hospital attention; the foot was placed in a cast and it was not until August or September that he was released for light work by the company physician. There was testimony that even then he was not able to continue his work, being unable to stand on the injured foot for very long on account of the soreness and pain.

Claim for compensation was filed with the Kansas workmen's compensation commissioner on February 25, 1939. The parties stipulated that the relation of employer and employee existed; that the respondent is a self-insurer; that the claimant met with an accidental injury in the course of his employment; that medical service was furnished to the claimant by respondent, but that no compensation had been paid. It was also stipulated that the questions at issue were the weekly wage of the claimant; the number of working days per week; whether the respondent had notice of the injury; whether claim for compensation was made as required by law; whether the parties are governed by the act; the extent of the claimant's injury and disability and the amount, if any, to which he may be entitled.

Hearing was held before the compensation commissioner on March 21, 1939. At the conclusion of the evidence the respondent moved to dismiss the proceedings on the ground that the claimant and respondent were engaged in interstate commerce at the time of the accident, and that therefore claimant's remedy, if any, was under the federal employers' liability act.

The compensation commissioner made an award in favor of the claimant, based upon a finding that he had suffered "a disability which is permanent and total," entitling him to four hundred fifteen weeks' compensation at the rate of $14.45 a week. The respondent was also directed to "tender to, and if accepted, furnish to claimant such additional medical treatments by a competent orthopedic surgeon as will aid in curing and relieving claimant from the effects of his injury, respondent's liability for all medical and hospital services rendered not to exceed five hundred dollars."

In addition to narration of facts and reference to portions of the testimony, the compensation commissioner in his decision discussed at some length the question of whether claimant was engaged in interstate commerce at the time of the accident, saying in part:

"At the time John O. Krouse was injured the engine was standing on the siding or track near the roundhouse of respondent company in Kansas City, Kansas. At that particular time it was not engaged in switching cars. No crew had charge of the engine. In fact, the only person on the engine at the time was the claimant herein, and certainly the engine could hardly of itself be engaged in the business of switching cars in either interstate or intrastate traffic. The engine was at the time of the accident standing perfectly still and could not in the ordinary course of events move except by the aid of some human agency, and this workman, while refueling or filling the water tank

on the engine, slipped and fell. It is the judgment of the commissioner that the engine at this time was not engaged in either interstate or intrastate commerce—in fact, that the engine itself was doing nothing, but awaiting action upon the part of some human agency before it could become a moving factor."

Notice of appeal to the district court was filed by respondent on May 13, 1939, and on June 22, 1940, the district court entered judgment approving and adopting the award and all findings of fact and conclusions made by the compensation commissioner. From which judgment the instant appeal was taken.

Several preliminary propositions need to be stated before proceeding to the main issue. The first one is that it is not necessary that a railroad employee's work shall be exclusively related to or connected with interstate commerce to bring him within the federal act. If a substantial part of his work is in interstate commerce, within the meaning of the federal act, he is held to be under that act even though part of the traffic affected by his labors is intrastate in character. (*Erie R. R. Co. v. Winfield*, 244 U. S. 170, 37 Sup. Ct. 546, 61 L. Ed. 1057.) However, the question of whether he is under the federal act depends upon the nature of his work at the time the accident occurs and not upon the nature of the work which he generally or usually performs. (*Erie Railroad Company v. Welch*, 242 U. S. 303, 37 Sup. Ct. 116, 61 L. Ed. 319; *Ill. Cent. R. R. v. Behrens*, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051; *Middleton v. Southern Pac. Co.*, 61 F. 2d 929.)

Another proposition, well established, is that a railroad employee whose work at the time of an accident brings him within the provisions of the federal employers' liability act is not then subject to state workmen's compensation laws. In *Natney v. Railway Co.*, 102 Kan. 293, 169 Pac. 1150, this court, following the rule laid down by the United States supreme court in *New York Central R. R. Co. v. Winfield*, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045, held that liabilities of interstate carriers to make compensation for personal injuries to employees engaged in interstate commerce are regulated both inclusively and exclusively by the federal employers' liability act and that no field remains for state legislation on this subject "even in respect of injuries occurring without fault, as to which the federal act provides no remedy." (See, also, G. S. 1935, 44-506.)

It follows that if the appellee at the time of the accident was performing work connected with the operation of an instrumentality

of interstate commerce or so closely related thereto as to be an essential part of it, he was subject to the federal act and not to the Kansas workmen's compensation act.

Engine number 301 was a switch engine of the class used for doing the heaviest work and was employed in the Armourdale yard where many trains are made up for movement both east, northwest and southwest. On April 16, the day before the accident, it went into service at three o'clock in the afternoon and continued in active service until seven o'clock a. m. April 17. During that sixteen-hour period it was exclusively employed in making up trains for movement to points beyond Kansas in Missouri, Iowa, and other states. At seven o'clock in the morning it was taken into the roundhouse for inspection, in accordance with the regular procedure for inspection, fueling, watering and sanding. It is not contended that any repairs were required upon it; it was in the roundhouse for the required inspection and servicing about an hour and a half. About eight-thirty a. m. it was brought out and placed on what is called an outbound engine track which is located near the roundhouse and where engines are placed in charge of engine herders awaiting the engine crews that are to take them over. At about twelve-thirty p. m. engine number 301 was taken over by the crew and the remainder of the day was employed in making up trains carrying freight into Colorado, Texas, and other states, as well as freight for delivery within Kansas.

At this point there is a disagreement between the appellants and appellee as to whether at the time appellee was performing his duties engine number 301 had been specifically assigned to the work actually performed later during the day. After careful examination of the record we think that appellants' contention that the engine had been specifically assigned is clearly supported by the testimony and that there is no substantial testimony to the contrary. The appellee calls attention to answers made by Reeves, trainmaster, who had supervision of train movements and locomotive power in the Armourdale yard as follows: "Q. At the time that engine was placed on the track at that point next to the roundhouse office, was there a definite assignment of that engine to a particular job? A. Yes. That engine was brought out there and assigned to that change when we made it at noon. Q. At 12:30? A. Between 12:30 and 1:00. At this time we turned it in at 12:30 and got it out at 1 o'clock." It is argued that this testimony shows that engine number

301 was not actually assigned to any particular work until 12:30 or 1 o'clock—several hours after the accident. That interpretation is plainly negatived by the remainder of Reeves' testimony. It is clear that he meant that the *"change"* and not the *assignment* was made at noon. The preceding question was: *"At the time* that engine was placed on the track at that point next to the roundhouse office *was there a definite assignment* of that engine to a particular job?" To which the witness answered: "Yes." Moreover, further questions and answers by Reeves during the same examination were as follows:

"Q. At the time that engine was brought out from the roundhouse prior to 8:30 a. m., April 17, after having been inspected and sanded and fueled for Mr. Krouse to perform his duties in keeping up the steam, watering and so forth, was that engine at that time definitely assigned to particular work? A. To that particular job; yes, sir. And the engine was out there waiting for this west train yard engine crew.

"Q. The engine was waiting for the crew to take over? A. It was serviced and all ready for us to come over and get it, and assigned to that particular job.

"Q. Under particular orders by whom? A. By me.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Did I understand you right to say they don't, without orders from you, ordinarily take an engine that has that assignment [eastbound trains] and have it make up westbound trains? A. No, I don't think you understand what I said. This engine from the assigned period of 3 p. m. on the 16th to 7 a. m. on the 17th, a 16-hour period, was assigned to make up eastbound and northbound trains. Then he turned in to the roundhouse—.

"Q. Just before he turned in to the roundhouse: Did you at that time know what it was to do the following period? A. Yes. If there was no defects that would take the engine out of service, I knew right what the engine was going to do.

"Q. And had you already instructed the crews as to what they were to do with that engine? A. Yes, sir."

The appellee also stresses Reeves' testimony to the effect that if anything radically wrong had been discovered with engine number 301 while it was awaiting the crew another engine would have been substituted, and contends that this indicates that no definite assignment had been made. We cannot agree with that conclusion. The fact that the engine would be replaced by another if anything radically wrong with it developed while Krouse was in charge in no way alters the fact that its assignment to a definite task had been made and that it was in a stand-by condition awaiting the crew. Nothing wrong developed and the appellee testified that just before

the accident he had done the last thing necessary for the engine to continue its work. In due course the crew took over the engine for the work to which it had been assigned. The work actually then performed was largely interstate in character.

The provisions of the federal employers' liability act, hereinafter called the federal act, pertinent to our inquiry, reads as follows:

"Every common carrier by railroad while engaging in commerce between any of the several states or territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . . . " (45 U. S. C. A., § 51.)

It is well to make clear that the issue here is not whether appellee's employment, at the time of the injury, might be regarded as a part of "interstate commerce," broadly considered. If that were the question the answer could hardly be considered difficult. Certainly many activities, far less obviously a part of "interstate commerce," have been declared subject to federal regulation under the steadily expanding interpretations of the commerce clause of the federal constitution. But we are not here inquiring as to how far congress might have gone in placing various employments by interstate carriers under an employers' liability law, but are only concerned as to how far in fact it did go in that direction in this particular enactment; more specifically, whether it went far enough to bring appellee's employment at the time of the accident within the federal act. By judicial interpretations it has been well established that the act does not include all carrier activities.

Perhaps the leading early case defining the scope of the federal act is *Shanks v. Del. Lack. & West. R. R. Co.*, 239 U. S. 556, 36 Sup. Ct. 188, 60 L. Ed. 436, wherein the supreme court said:

"Having in mind the nature and usual course of the business to which the act relates and the evident purpose of Congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion . . . and that the true test of employment in such commerce in the sense intended is, Was the employee, at the time of the injury, engaged in interstate *transportation,* or *in work so closely related to it as to be practically a part of it?"* (Italics ours.) (p. 558.)

It will be noted that in stating the test to be applied the court used the words "interstate *transportation"* rather than the words "interstate *commerce."* The test so stated in the Shanks case was repeated soon afterwards in *Chi. Burlington & Q. R. R. Co. v. Har-*

*rington,* 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941. The significance of the use of the word "transportation" instead of the word "commerce" has been recognized in more than one subsequent decision. In *Chicago & N. W. Ry. Co. v. Bolle,* 284 U. S. 74, 78, 52 Sup. Ct. 59, 76 L. Ed. 173, the United States supreme court said, in referring to the Shanks case, *supra:*

"It will be observed that the word used in defining the test is 'transportation,' not the word 'commerce.' The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term."

In *Chicago & E. I. R. Co. v. Commission,* 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304, the cases of *Erie R. Co. v. Collins,* 253 U. S. 77, 40 Sup. Ct. 450, 64 L. Ed. 790, and *Erie R. Co. v. Szary,* 253 U. S. 86, 40 Sup. Ct. 454, 64 L. Ed. 794, were specifically overruled with the comment that in those cases the rule of the Shanks and Harrington cases, *supra,* had not been followed—the words "interstate *commerce*" having been inadvertently substituted in those two cases for the words "interstate *transportation.*"

It may be noted at this point that as to federal statutes the interpretation placed upon them by federal courts, and particularly by the United States supreme court, is controlling upon state courts. (*Schaefer v. Lowden,* 147 Kan. 520, 78 P. 2d 48, and cases there cited.)

The cases dealing with the instant question are well-nigh numberless. They deal with all sorts of situations. Appellants and appellee have discussed a large number of them in well-prepared and helpful briefs. All the cases cited, and many others have been here examined. It is obviously impossible to harmonize all the decisions, but we find little inconsistency in the later decisions and it seems evident where the very great weight of authority rests. Two general propositions clearly emerge. The first proposition is that the application of the rule stated in the Shanks case, *supra,* has tended to place in a class *outside the act* those activities or labors which are not directly and intimately connected with *movement of traffic,* with *transportation* per se, and to place in a class *within the act* those labors which are so connected. With employments falling in the first class we are not now concerned. The employment which most obviously falls within the second class is employment in the operation of trains, the movement of cars and engines. Many other kinds

of employment such as the work of train dispatchers, operation of signal devices, etc., are also readily classified in the second class.

The second proposition, which contributes to the harmonizing of the decisions, is that employment in connection with a car, or an engine, or other instrumentality directly concerned in movement, in transportation, or closely related thereto, is held to be within the federal act if the car or engine is either actually operating interstate or handling interstate business, or is only temporarily removed therefrom for routine inspection or "running repairs" or servicing, but is held to be outside the act if the car or engine has been taken out of active service for substantial repairs or for other purpose.

It would unduly prolong this opinion to discuss all the cases cited in the briefs. We consider first some of the cases upon which the appellee mainly relies.

In *Chicago & E. I. R. Co. v. Commission,* supra, the employee was oiling a motor used in supplying power for hoisting coal into a chute, the coal to be used as needed by engines engaged principally but not entirely in moving interstate freight. Applying the test of the Shanks and Harrington cases, *supra,* the court held that the employee's work was not closely enough related to actual transportation to bring it within the federal act.

In *N. Y., N. H. & H. R. Co. v. Bezue,* 284 U. S. 415, 52 Sup. Ct. 205, 76 L. Ed. 370, decided January 25, 1932, the supreme court held outside the act an employee who was helping make repairs on a locomotive, and the basis for the decision was that the locomotive was in the shop for its monthly boiler wash and for *various repairs taking twelve days to perform.* Many of the engine parts had been removed and the injury took place while the employee was helping to remove the main driving wheels from a lathe and move them into place for reinstallation. The court stated that the question of whether respondent was within the act must be decided not by reference to the kind of plant in which he was working "but by determining whether the locomotive in question was, at the time of the accident, in use in interstate transportation or had been taken out of it. The length of the period during which the locomotive was withdrawn from service and the extent of the repairs bring the case within the principle announced in *Industrial Accident Comm. v. Davis,* supra, and *Minneapolis & St. Louis R. Co. v. Winters,* 242 U. S. 353, stamp the engine as no longer an instrumentality of or intimately connected with interstate activity, and distinguish such cases as *New York Cent. R*

*Co. v. Marcone*, 281 U. S. 345, where the injured employee was oiling a locomotive which had shortly before entered the roundhouse after completing an interstate run." In the Marcone case, referred to above, the employee was held to be within the act although the active service of the engine had been temporarily interrupted for servicing in the roundhouse.

For a like reason—that the engine or car had been withdrawn from active service in order to undergo substantial repairs—the employment was held outside the act in *Minneapolis & St. L. R. Co. v. Winters*, supra; *Toussaint v. Railway Co.*, 340 Mo. 578, 104 S. W. (2d) 263; *Hines v. Industrial Acc. Com.*, 184 Cal. 1, 192 Pac. 859; *Davis v. Baltimore & O. R. Co.*, 10 F. 2d 140. The distinction between cars and engines undergoing an "interruption of actual use" for ordinary or "running" repairs and held to be under the federal act, and a "withdrawal from service" for general or "shop" repairs and held not under the act, is clearly stated in *Industrial Accident Co. v. Davis,* supra, with numerous supporting cases cited. In the one case there is merely an interruption of service, while in the other there is a completed service, a withdrawal from service.

Other cases cited by appellee are readily distinguishable from the case at bar under the rule emphasized in *Chicago & E. I. R. Co. v. Commission,* supra—employment not closely connected with actual *transportation.* In *Raymond v. Chi., Mil. & St. P. Ry. Co.,* 243 U. S. 43, 37 Sup. Ct. 268, 61 L. Ed. 583, the workman was helping bore a tunnel to be used by the railroad; in *Louisville & N. R. Co. v. Brittain,* 93 F. 2d 159, a repairman was injured while hauling timber to repair a station; in *Pennsylvania R. Co. v. Manning,* 62 F. 2d 293, a workman was inspecting a motor used to supply power to a crane which loaded and unloaded cars; in *Chicago & N. W. R. Co. v. Bolle,* supra, the laborer was employed to fire a stationary engine to generate steam to heat a depot and other buildings, and the court said that "his duty ended when he had produced a supply of steam" and that "what he produced was not used or intended to be used, directly or indirectly, in the *transportation* of anything." (Italics ours.)

The Kansas cases cited by appellee are quite in line with the federal cases, *supra.* In *Defenbaugh v. Railroad Co.,* 102 Kan. 569, 171 Pac. 647, the car upon which the workman was making repairs had been inspected after an interstate trip, found out of order, and "was entirely out of commercial service and was not used for any

commercial purpose" and therefore, not within the federal act, citing the Winters case, *supra*. In *Begley v. Missouri P. R. Co.*, 128 Kan., 790, 280 Pac. 902, the workman was injured while lifting a discarded rail which had been left on the side of an embankment near a switch track. Citing *Pedersen v. Del. Lack. & West. R. R. Co.*, 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, which laid down substantially the same test as that of the Shanks case, *supra*, it was held that the employment was not so closely related to interstate commerce as to bring it within the federal act. The court commented: "It was a matter of indifference so far as that [interstate] commerce is concerned whether the rail was taken to the junk pile or left where it lay." In *Cruse v. Chicago, R. I. & P. Rly. Co.*, 133 Kan. 340, 299 Pac. 624, the workman was unloading a car of material which had been consigned to and delivered to the railway company. The injury occurred four days after the car arrived and while being moved to another part of the yard where it was to be unloaded and used. Clearly this car had lost its interstate character and the court held the injury not covered by the federal act.

Practically all of the above cases indicate a line of distinction which supports appellants' contention.

From the cases cited by appellants involving more or less comparable situations and employment, we summarize briefly a few of the federal cases only to indicate the various employments which have been held within the act:

Workman had been greasing engines in a roundhouse for inspection, the last engine upon which he worked being used in pulling interstate trains and had not been withdrawn from service. His body was discovered underneath the tender of an engine being backed from the roundhouse. (*New York Cent. R. Co. v. Marcone*, 281 U. S. 345.)

Engine fireman killed while crossing tracks to an eating house after servicing his engine preparatory to an intrastate run, the train to contain some interstate cars. (*Nor. Car. R. R. Co. v. Zachary*, 232 U. S. 248, 34 Sup. Ct. 305, 58 L. Ed. 591.)

Brakeman on a train moving intrastate but containing interstate as well as intrastate cars. Injured while helping uncouple intrastate cars. (*N. Y. Central R. R. Co. v. Carr*, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298.)

Repairman making minor repairs while engine standing on "fire track," for such purposes, for four or five hours awaiting return interstate trip. (*Baltimore & O. R. Co. v. Darr*, 204 Fed. 751.)

Employee working on a locomotive used in hauling cars mainly interstate. Injury while locomotive in roundhouse for over twenty-four hours for "cleaning the firebox, boiler wash, and light running repairs." (*Voelker v. Delaware, L. & W. R. Co.*, 31 Fed. Supp. 387.)

(See, also, *Akins v. Railway Co.,* 109 Kan. 474, 199 Pac. 464, employee repairing the pilot on an engine in a roundhouse between interstate trips [Certiorari to United States supreme court denied]; *McMahen v. Mo. Pac. Rd. Co.,* 186 Ark. 399, 53 S. W. 2d 998; *Southern Pac. Co. v. Industrial Acc. Com.,* 179 Cal. 59, 175 Pac. 453; *Baltimore & O. R. Co. v. Kast,* 299 Fed. 419, 421; *Staley v. I. C. R. R. Co.,* 268 Ill. 356, 109 N. E. 342, 343.)

The question of whether appellee's employment at the time of the accident, as clearly shown by the facts, brought it within the federal act is a question of law. (*Begley v. Missouri P. R. Co.,* supra, and cases therein cited.)

We conclude that under the rules and precedents established by the federal courts appellee's employment at the time of the accident clearly classifies the case within the federal act. The locomotive he had been servicing was a switch engine of a heavy type used in doing the heaviest work required in the yards. For the sixteen-hour period prior to the accident it had been exclusively engaged in making up trains for interstate movement. It had been taken to the roundhouse for routine inspection and servicing, which required something less than an hour and a half. Its fires were kept burning. It was found in order and no repairs required. Prior to the accident it had been brought from the roundhouse, placed on the track usually used for live switch engines awaiting operating crews and for receiving the required attention from engine herders. It was in a stand-by condition, live and ready to continue its active service. It had been assigned to further work that day in making up trains containing cars for both intrastate and interstate movement. Following the accident it was taken over by the crew and performed that day the work to which it had been assigned. Obviously, an engine in such service falls within the class hereinbefore discussed, of instrumentalities of *transportation,* as distinguished from other facilities only related to interstate commerce generally. The work which appellee performed was essential to its continuing service. The fact that it was motionless at the time of the accident—a fact upon which the compensation commissioner seemed to lay some stress—certainly does not alter its character as an active instrumentality of transportation. Every locomotive is motionless every time it stops—"awaiting action upon the part of some human agency before it could become a moving factor" to use the language of the compensation commissioner. To hold that

such routine interruptions to actual movement operate to exclude employment, during the brief period of inactivity, from protection of the federal act would not only introduce intolerable uncertainty but result in gross injustice to employees in countless cases of accident.

The conclusion already stated makes it unnecessary to consider appellants' other assignments of error.

There remains for brief comment appellee's contention that by filing a report of the accident with the Kansas workmen's compensation commissioner, and by furnishing medical and hospital attention to the employee, appellants are estopped from denying the commissioner's jurisdiction. The argument is not persuasive. Employers—even those who have elected not to come under the state act—are required by law to report accidents and claims of accidents occurring in their business. (G. S. 1935, 44-557.) Of course a mere compliance with the statutory requirement of reporting accidents cannot be regarded as an admission by the carrier that the compensation commissioner has jurisdiction to make a compensation award. Indeed, it may well be doubted whether any employer could make such a waiver in cases where state jurisdiction has been ousted by operation of law through federal preëmption of the field. It is equally apparent that under the facts of this case, the furnishing of medical aid constituted no waiver of the plea to the jurisdiction. Cases holding that the furnishing of such aid is equivalent to payment of compensation are not in point in determining the question of jurisdiction itself where, from the very beginning of the proceeding, the employer denied the jurisdiction of the compensation commissioner.

The judgment is reversed and the case remanded with directions to enter judgment for the defendants.