BISCHOFF v. AMERICAN CAR & FOUNDRY CO.

MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—INJURY ARISING OUT OF AND IN COURSE OF EMPLOYMENT.

Claimant was a molder in the factory of defendant and had charge of a floor, so-called, operating an electric crane in furtherance of his work. He was a foreigner and did not understand English clearly. His superior servant had

directed him to report anything wrong about the crane to a machinist, and not to go on the crane. While the machinist was attempting to repair the machinery of the crane, that had gotten out of order, claimant went up the ladder to point out the source of difficulty, but was injured by the starting of the crane as he attempted to descend. *Held*, that the injury was not received out of or in the course of his employment, and the question whether or not his injury was caused by intentional and wilful misconduct was not material; that the work he had been employed to do might not be enlarged so as to permit recovery by any direction given by his superior or by the fact that he may have thought the act would benefit his employer. KUHN, BIRD, and MOORE, JJ., dissenting.

Certiorari to the Industrial Accident Board. Submitted January 12, 1915. (Docket No. 69.) Decided March 30, 1916.

George Bischoff presented his claim against the American Car & Foundry Company, a New Jersey corporation, for compensation for injury to claimant's right hand. From an order awarding compensation respondent brings certiorari. Reversed.

*Angell, Bodman & Turner*, for appellant.

*Barbour, Field & Martin*, for appellee.

PERSON, J. On the 16th day of September, 1913, the claimant was, and for more than a year had been, employed by the American Car & Foundry Company as a molder. In the forenoon of that day his right hand was caught in the gear wheels of an electric crane and so crushed as to require the amputation of the larger portion of it. The committee of arbitration appointed under Act No. 10, Extra Session 1912 (2 Comp. Laws 1915, § 5423 *et seq.*), having found the claimant entitled to compensation, and the amount of such compensation having been increased on appeal to the Industrial Accident Board, the employer brings the case here for review, insisting that the injury re-

ceived by the employee did not arise "out of and in the course of his employment," that it was the result of his own "intentional and wilful misconduct," and that the compensation allowed is excessive.

As this act provides compensation only for such injuries as are received in the course of the employment, and then only when they grow out of the employment, and as injuries received outside the employment are not within the provisions of the act at all, it must follow that the "intentional and wilful misconduct" which operates to debar the employee from the compensation which he might otherwise receive refers to such misconduct within the scope of his employment. If the injury to the employe was not received "in the course of his employment," it is immaterial whether it was caused by his "intentional and wilful misconduct" or not.

The first question therefore to be determined is whether the injury received by claimant arose out of and in the course of his employment. And in this connection the findings of fact made by the Industrial Accident Board and returned to this court, being well supported by the evidence, are controlling so far as they go. Such findings are as follows:

"(1) On the 16th day of September, 1913, George Bischoff, claimant and appellee, was employed as a car wheel molder at the Detroit plant of the American Car & Foundry Company, a New Jersey corporation, engaged in the manufacture of cars, car wheels, etc. He was at that time 29 years of age, and had been in the employ of the appellant 3½ years, 2 of which he had spent working as helper to a molder, and 1½ of which he spent working as a molder.

"(2) The foundry in which appellee worked at the time, of the accident was divided into 14 'floors' about 9 feet apart. Each 'floor' consisted of a row of molds, 25 molds in length, located on one level or general ground floor of the foundry. A molder was in charge of each one of these 'floors.' At a distance of about

15 feet above each 'floor' was located a crane, the motive power of which was electricity; 240 volts being required to operate it. Appellee was in charge of a 'floor' over which was located crane No. 8, three photographs of which were introduced in evidence as appellant's Exhibits A, B, C. From the floor appellee, as part of his work, operated the crane forward and backward and up and down as might be necessary in doing his work. The crane could be reached only by climbing a brace located near it or by a ladder which must be especially placed for the purpose.

"(3) There is nothing in the occupation of a molder which would require him to go upon the crane for the purpose of repairing it should it be out of order; a machinist and electrician being employed by appellant to make the necessary repairs. Appellee understood that he was employed as a molder, and in no other capacity; that all his duties relative to such employment were ordinarily to be performed on the floor; that he must use the crane to do his work; that, if the crane was out of order and he could not use it or operate it, he should report it to the machinist or electrician, and, if they could not be found, he should sit down or go home.

"(4) Instructions had been given by the superintendent to the foreman to allow no one but the men designated for such work to go upon the crane, and these instructions had been given to the molders by the foreman, but appellee could not speak nor fairly understand either English or the language of his foreman. Appellee had, in fact, gone up to fix or oil the crane several times before the date of his injury.

"(5) A short time before the injury, appellee discovered that the crane was out of order and reported to the machinist, who was also a foreman, that the crane was not working well, because the brake was too loose. Appellee is a German, and the machinist is a Croatian; appellee could not talk with the machinist very well, because they did not speak the same language; yet he could indicate in broken English that 'the brake is too loose,' and by showing the machinist say enough in English to inform him what the trouble with the crane was.

"(6) While the machinist was up on the crane look-

ing for the trouble, appellee, not being able to make him fully understand in English, went up the ladder and got off where the machinist was to point out to him where the trouble was.

"(7) After being on the crane five minutes appellee started to go down the ladder. In some way the machinist or appellee set the machinery in motion, and appellee's hand was caught in certain gear wheels, and all that part including the four fingers was amputated from a point on the metacarpal bone of the little finger about an inch and three-quarters below the wrist joint diagonally across the hand to a point two and a half inches below the wrist joint, leaving the thumb entirely uninjured.

"(8) It was mutually conceded by the parties that, if appellee is entitled to anything, he is entitled to the maximum compensation of $10 a week."

If a workman is injured while voluntarily doing something quite outside the scope of the work he is employed to do, it cannot well be said that such injury "arises out of and in the course of his employment." This is illustrated by the old case of the boy who was engaged to hand balls of clay in molds to a molder, and was told not to touch the machinery; but, having nothing to do for the moment, he did attempt to clean the machinery, and was injured. It was necessarily held that the injury did not "arise out of and in the course of his employment." *Lowe* v. *Pearson,* 1 W. C. C. 5. It was also held that the injury did not arise out of and in the course of the employment where a girl left her work to start an engine when the person whose particular duty it was to do so happened for the moment to be absent. *Losh* v. *Evans & Co.,* 5 W. C. C. 17.

In other words, the work which one is employed to do, when construed in a reasonably broad and comprehensive way, does limit and mark out "his employment," within the meaning of the statute. Of course, the scope of such particular employment may be en-

larged for the time being by the directions of some superior who has authority; and in the case of an actual emergency it may be held that any reasonable attempt to preserve the employer's property is within the general lines of an employee's duty. But ordinarily the scope of a workman's employment is defined by the things he is employed to do, and the things reasonably and fairly incident thereto.

Notice must be taken that a factory of today usually includes within the field of its operations many fairly distinct lines of work, from that of the roustabout engaged in the ordinary labor that almost any one may perform, to that of the expert mechanic, which can be done safely by those only with skill and experience. The difference between these various kinds of work was always recognized by the common law, and it was held to be negligence for the master to require of the servant, without warning and instructing him, the performance of work outside of and more dangerous than that which the latter had contracted to perform. Such classification of work exists in the very nature of things, and as much under the statute as at common law. Its recognition is required by any proper organization of a factory, not only for efficiency, but as well for the purpose of guarding against accident and injury. And if a workman, when there is no emergency, should, of his own volition, see fit to intermeddle with something entirely outside the work for which he is employed, he ought not to be allowed compensation upon the mere plea that he thought his act would be for the benefit of his employer. That plea may be of value under some circumstances, but it cannot authorize an employee to voluntarily take upon himself the performance of work for which he was not employed.

In the case at bar the crane, in connection with which the accident occurred, was located on beams some 15 feet above the floor where the claimant was required

to work.   It could be reached only by use of a ladder to be obtained and placed for that purpose, or by climbing upon a brace which was not intended for such use. Its location was as separate and distinct from the floor where the claimant worked as if it had been in another room or in another building.   The crane was operated by electricity, and 240 volts were required for that purpose.   It was dangerous to get upon it, or to intermeddle with it, as is stated repeatedly in the testimony and is shown by the accident itself.   And this the claimant must have known as well as anybody.   Two experts were employed by the company for the particular purpose of repairing the cranes if they should get out of order.

It is expressly found by the Industrial Accident Board, and we are bound by the finding, that the claimant understood he was employed as a molder, and in no other capacity, and that there was nothing in the occupation of a molder which would require him to go upon the crane for the purpose of repairing it should it be out of order.   A more definite and explicit finding as to what was within the scope of his duties and what was without such scope could not well be made.   The Industrial Accident Board also finds that instructions had been given by the superintendent to the foreman to allow no one but the men designated for such work to go upon the crane, and that these instructions had been given to the molders by the foreman.   The superintendent testifies that one reason for these instructions was the safety of the molders.   It is true the board also finds that the claimant could not speak nor fairly understand either English or the language of the foreman, but it makes no express finding as to whether the claimant did or did not actually and in fact understand these instructions.   Whether the claimant really understood them or not, he certainly did understand from the foreman that he was to report to the machin-

ist or to the electrician any defect in the operation of the crane, and, if they could not be found, that he should sit down or go home. This is found by the board from his own testimony.

On the day of the injury the crane used by claimant in his work did not operate properly, and he reported it to the machinist. It does not appear from the claimant's testimony that he had any difficulty in making the machinist understand the trouble with the crane. He says that he told the machinist that it was not good and that the brake was too loose. Thereupon the machinist got a ladder and climbed upon the crane to repair it. After the machinist had got upon the crane the claimant followed him up the ladder, and also up on the crane. No communication whatever between the two had been attempted after the machinist had started up the ladder and while the claimant was on the floor. In other words, the claimant did not climb up to and upon the crane because of any failure to make the machinist understand anything he was trying to tell him at the time. What the claimant did after getting upon the crane was to point out to the machinist.what claimant thought ought to be done in making the repairs. He did not apparently go up for the purpose of reporting the condition of the crane, but to suggest to the machinist what the latter ought to do to remedy the difficulty. The claimant appears to have fully understood the danger of being on the crane, because he says that as soon as he found the switch had not been opened he at once started to go down. In doing this he placed one hand upon the large wheel, when in some way the machinery was started, and his hand was crushed.

The very thing that the claimant attempted to do was the very thing that the Industrial Accident Board has expressly found to have been outside the limits of his employment. The finding of the board is:

"There is nothing in the occupation of a molder which would require him to go upon the crane for the purpose of repairing it should it be out of order; a machinist and an electrician being employed by appellant to make the necessary repairs. Appellee understood that he was employed as a molder, and in no other capacity."

The very thing he did do was to climb upon the crane, not for the purpose of reporting that it was out of order, but to direct the machinist in the performance of his duty. And he did this, well knowing the danger to which he was subjecting himself. In the face of the express findings of the board, which, as we have said, are warranted by the evidence, it does not help claimant any that on several previous occasions also he had gone outside the limits of his employment by climbing upon the crane.

The orders allowing compensation must be reversed and set aside.

STONE, C. J., and OSTRANDER, STEERE, and BROOKE, JJ., concurred with PERSON, J.

BIRD, J. (*dissenting*). The sixth finding of fact of the Industrial Accident Board was:

"While the machinist was upon the crane looking for the trouble, appellee, not being able to make him fully understand in English, went up the ladder and got off where the machinist was to point out to him where the trouble was."

This finding of fact seems to me to be justified by the record. Claimant did not go up on the crane to repair the defect in violation of the rules. He went there merely to point out the defect which he was unable to describe in words to the machinist. To do so was to hasten the repair of the machine, which ordinarily would be to the advantage of both claimant and master. I am of the opinion that claimant's conduct

should not be characterized as "intentional and wilful misconduct." Neither am I of the opinion that we should hold that claimant, in going up on the crane under such circumstances, was acting outside of the scope of his employment. The cases cited by Mr. Justice PERSON on this question were instances where the servant left his particular work and meddled with machinery with which he had nothing to do. The machine in the present case was operated by claimant. When it was out of repair his work stopped. He knew where the defect was; the machinist did not, for the moment. In an attempt to point out the defect claimant was injured. His effort was made in furtherance of the master's business, and it should not deprive him of the award.

The finding of the Industrial Accident Board should be affirmed.

KUHN and MOORE, JJ., concurred with BIRD, J.