SOUTHERN SURETY CO. v. STUBBS et al.
(No. 7464.)

(Court of Civil Appeals of Texas. Galveston Nov. 22, 1917. On Motion for Rehearing, Dec. 20, 1917.)

1. MASTER AND SERVANT ⬯396 — CONCURRENT JURISDICTION OF FEDERAL COURTS — ADMIRALTY.

An action on a policy issued under the Texas Workmen's Compensation Act (Vernon's Sayles' Ann. Civ. St. 1914, §§ 5246h–5246zzzz) for the accidental drowning of the insured while at work on a dredge upon navigable waters of the United States, as an employé of the subscriber, is not one within the exclusive admiralty jurisdiction of a federal court, but may be brought in the state courts.

2. MASTER AND SERVANT ⬯375(1)—INJURIES TO SERVANT — WORKMEN'S COMPENSATION —"COURSE OF EMPLOYMENT."

An assistant engineer who was employed on a dredge and whose duties required him to spend his hours off duty on board, who was accidentally drowned in a storm while off duty and while engaged in attempting to save the dredge from shipwreck, was killed in the "course of his employment" within the Texas Workmen's Compensation Act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Course of Employment.]

3. MASTER AND SERVANT ⬯372—INJURIES TO SERVANT — WORKMEN'S COMPENSATION — "ARISING OUT OF EMPLOYMENT."

Where an assistant engineer on a dredge was accidentally drowned while off duty, but still on board, in attempting to save the dredge from shipwreck, the accident arose out of the employment within the Texas Workmen's Compensation Act.

4. MASTER AND SERVANT ⬯372—ACT OF GOD —DEATH OF SERVANT.

Where an assistant engineer was accidentally drowned while on board a dredge because of a violent storm, recovery on the insurance policy could not be defeated under Texas Workmen's Compensation Act because the accident was an act of God.

5. MASTER AND SERVANT ⬯385(1) — WORKMEN'S COMPENSATION—JUDGMENT.

Compensation under Texas Workmen's Compensation Act should be allowed up to the date of trial alone without prejudice to sue for unmatured further installments, and judgment should not be given for the total amount.

On Motion for Rehearing.

6. COSTS ⬯234 — ON APPEAL — PREVAILING PARTY.

Where on appeal the judgment was reduced, it was error to tax costs against appellant.

Appeal from District Court, Galveston County; Clay S. Briggs, Judge.

Action by Alva Stubbs and another, by next friend, Mrs. J. E. Gowland, against the Southern Surety Company, on a policy issued under the Texas Workmen's Compensation Act. Judgment for plaintiffs, and defendant appeals. Reformed and affirmed.

J. L. Darrouzet, of Galveston, D. T. Mason, of St. Louis, Mo., and J. A. Germany, of Dallas, for appellant. Frank S. Anderson, of Galveston, for appellees.

GRAVES, J. The appellees, Alva B. Stubbs, widow, and Richard Stubbs, minor, son of E. J. Stubbs, by Mrs. J. E. Gowland, as next friend, sued appellant for the compensation alleged to be due them upon a policy under the Texas Employer's Liability Act, by reason of the drowning of E. J. Stubbs during the storm which raged on the coast of Texas on the 16th and 17th days of August, 1915, while he was employed as assistant engineer on the dredgeboat Houston, then being operated by the Standard American Dredging Company in Texas City Channel, the drowning being due to the capsizing of the dredgeboat.

Appellant answered by general demurrer and general denial, and specially that E. J. Stubbs, at the time of his death, was not "in the course of his employment," and not pursuing the duties for which he was employed, and, further, that his death was the direct and proximate result of the act of God, for which no liability would attach on its part.

The case was tried before the court without a jury, resulting in a judgment for the plaintiffs for the sum of $5,400, being compensation at the rate of $15 per week for a period of 360 weeks, commencing on the date of the death of E. J. Stubbs, this sum of $5,400 to be paid by appellant in 360 weekly installments of $15 each, commencing on the 17th day of August, 1915, together with interest at 6 per cent. from the maturity of each and every installment. From that judgment this appeal is taken.

[1] Subsequent to the filing of its brief in this court appellant has also filed here its suggestion that the district court of Galveston county was without jurisdiction of the subject-matter of this suit for the reason that

the accident occurred, under the findings of fact, upon the navigable waters of the United States, and was the result of one of the perils of the sea, bringing it within the exclusive admiralty jurisdiction of the federal courts, and asking on that account that the cause be reversed and dismissed.

The leading case relied upon in substantiation of this position is Southern Pacific v. Jensen, 244 U. S. 205, 37 Sup. Ct. 524, 61 L. Ed. 1086. But, after a careful examination of the Jensen Case, we conclude that it does not apply. That case arose under the Employers' Liability or Workmen's Compensation Act of the state of New York (Consol. Laws, c. 67), as the result of a fatal injury to a stevedore while unloading in New York Harbor, navigable water of the United States, a vessel engaged in interstate commerce. The action was directly against the employer, who, under that compulsory statute, had no option in the matter, as is allowed under our Texas law, but was required to subscribe and insure its employés thereunder. There was no question raised or involved respecting the jurisdiction of the state court over the subject-matter, and the United States Supreme Court, through a divided bench, held that the general maritime law, as accepted by the federal courts when acting in the exercise of their admiralty jurisdiction, must be adopted as the rule of decision by state courts of common law, when passing upon any case that might have been brought in the admiralty court, and that the particular New York compensation statute there involved attempted to give a remedy wholly unknown to the common law, conflicting in that respect with the United States Constitution, and for that reason was invalid; but we do not understand that opinion, nor any other to which we have been cited, to hold that the United States District Courts, sitting in admiralty, have exclusive jurisdiction of the subject-matter of suits in personam against the owner, where the subject-matter involves a cause of action of maritime origin; upon the contrary, we understand it to be the settled law of the federal Supreme Court, and so recognized in the Jensen Case, that in all such cases the state courts of common law have concurrent jurisdiction with the District Courts of the United States. Where, however, the suit is in rem against the vessel, the rule is otherwise, and the original jurisdiction of the federal courts is exclusive. Such, we think, is the effect of the prevailing opinion in the Jensen Case, and of the cases therein cited, from which these paragraphs are quoted:

"By section 9, Judiciary Act of 1789 (1 Stat. at L. 76, 77, c. 20), the District Courts of the United States were given 'exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, * * * saving to suitors, in all cases, the right of common law remedy, where the common law is competent to give it.' And this grant has been continued. Judicial Code, §§ 24 and 256 (36 Stat. at L.

1091, 1160, c. 231; Comp. Stat. 1916, §§ 991(1), 1233). * * *

"Exclusive jurisdiction of all civil cases of admiralty and maritime jurisdiction is vested in the federal District Courts, 'saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it.' The remedy which the [New York] compensation statute attempts to give is of a character wholly unknown to the common law, incapable of enforcement by the ordinary processes of any court, and is not saved to suitors from the grant of exclusive jurisdiction. The Hine v. Trevor, 4 Wall. 571, 572, 18 L. Ed. 456; The Belfast, 7 Wall. 624, 644, 19 L. Ed. 266, 272; American S. B. Co. v. Chase, 16 Wall. 522, 531, 533, 21 L. Ed. 369, 371, 372; The Glide, 167 U. S. 606, 623, 42 L. Ed. 296, 302, 17 Sup. Ct. 930."

Moreover, the accident here did not occur upon a vessel engaged in interstate commerce, but upon a dredge, which was shown to be not even seagoing, and hence for that reason was not within the purview of the federal Employers' Liability Act, as claimed by appellant, as well as for the further consideration that such act has reference to carriers by interstate railways alone, and not by water. Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. Stat. 1916, §§ 8657 to 8665, inclusive); New York Central Railway Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045, Ann. Cas. 1917D, 1139; Erie Railway Co. v. Winfield, 244 U. S. 170, 37 Sup. Ct. 556, 61 L. Ed. 1057.

As is elsewhere herein stated, this was not a suit in personam against the owner of a vessel to recover either upon a contract, or for damages for a maritime or other character of tort, but was upon an insurance contract against an insurer, who voluntarily and for a valuable consideration assumed the obligation to pay compensation to the employé or his beneficiaries, upon the happening of an accidental injury while in the course of his employment, and who received the benefits of that contract in the premiums paid it for carrying the risk. We therefore think that, in these circumstances, its claim that appellees mistook their forum cannot be availed of.

Upon these considerations the contention that the trial court had no jurisdiction is overruled.

Upon the merits the questions presented in appellant's brief for review, being five assignments of error, are: (1) Whether the court erred in rendering judgment for appellees because the death of deceased was the result of an act of God; and (2) in holding that deceased came to his death while acting in the course of his employment; and (3) in finding that the death of the deceased was the result of the perils of the sea, and therefore incident to his employment; and (4) in rendering judgment for the full amount of the compensation provided by law.

After reviewing the entire record, we are convinced that no one of these questions points out error, except that last mentioned relating to the amount of the judgment.

No statement of facts has been brought up with the record, and the most material fact findings of the trial court, none of which are attacked, were the following:

"That on the 16th and 17th days of August, 1915, one E. J. Stubbs was an employé of the Standard American Dredging Company, hereinafter referred to as 'subscriber,' under contract of hire at and in the county of Galveston, state of Texas, being so employed as assistant engineer on the dredgeboat Houston, which was engaged in dredging what is known as the Texas City Channel, in Galveston Bay, in said county, said dredgeboat Houston belonging to and being operated by the said subscriber, and that while the said E. J. Stubbs was so engaged and while acting in the course of his said employment the said dredgeboat Houston capsized, by reason whereof the said E. J. Stubbs was accidentally drowned.

"That the said dredgeboat Houston was actually engaged in the work of dredging the said Texas City Channel up to at least noon of Monday, August 16, 1915, and that the said E. J. Stubbs was then upon said dredge, actively in the discharge of his duties as assistant engineer and for and on behalf of the Standard American Dredging Company, and so continued after the actual work of dredging ceased, and all during the time that followed, up to the capsizing of said dredge and the accidental death by drowning of said Stubbs while in the course of his employment; that all during the period from about noon, or a little later, until the capsizing of said dredge, the said Stubbs, together with other employés engaged thereon, were, in the course of their duties, and as a part thereof, directed and required to do all they could to secure the said dredge against the storm and hurricane, which finally about 2:30 o'clock a. m. of Tuesday, August 17, 1915, engulfed and capsized said dredge, causing her to sink to the bottom of said Texas City Channel.

"That the superintendent or captain of said dredge, Capt. C. A. Lewis, was at all times in supreme command of said dredgeboat and the employés thereof, including the said E. J. Stubbs; that the said E. J. Stubbs was acting under the orders of the said superintendent and captain up to the time that the said Stubbs lost his life.

"That the storm or hurricane which sank said dredge, and during which the said Stubbs was drowned, was probably the most violent and severe which ever visited Galveston Bay and Island, when considered with reference to the velocity of the wind and duration of the storm.

"Said dredgeboat Houston was equipped with sleeping accommodations for the crew of said vessel, and while it was usual for the work to be done by such crew in eight-hour shifts, yet they could be, and were, under their contract of employment, required to work longer periods, being paid overtime for the period actually engaged in work beyond such period of eight hours, and were, under their said contract of employment, required to work overtime at periods of stress or danger to the dredge, its safety, or in the event of the breaking down of its machinery or other emergency, and said crew was subject to the orders of the superintendent or captain of said dredge at any and all times that he might choose to call them, and when not aboard the dredge and actually engaged in the performance of duties there. The said E. J. Stubbs being a member of the crew of said dredge and controlled accordingly, such employment required the said E. J. Stubbs to be and live upon said dredge a large part of the time.

"I further find that the sinking and capsizing of the dredge, caused by the violence of the storm, was one of the perils of the sea, and a risk arising out of and in the course of the employment of the deceased.

"At the time that the dredge Houston ceased the actual work of dredging said channel at or about noon, Monday, August 16, 1915, the storm and hurricane had so developed in violence and intensity that such work could proceed no further, and it became necessary to secure the dredge; that is, to make it as tight and fast as possible to keep it from foundering from the violence of the storm. There was at such time a large and small gasoline launch belonging to said dredge, and used in connection with its operation; but said larger launch was at Texas City, and not at the dredge, when such actual work of dredging ceased on board the dredge, but the smaller launch was there.

"Several efforts on the part of the larger launch to reach such dredge from Texas City were made, but the larger launch was unable, owing to the violence and intensity of the storm, to reach said dredge. Independent efforts were also made in Galveston to secure a boat or vessel to go to said dredge Monday afternoon, August 16, 1915, but no vessel could be secured to go owing to the violence of the storm.

"The United States Weather Bureau sent out warnings of the storm of 1915, but the storm which came was unexpected in severity and duration, and was much more violent that the Weather Bureau had anticipated, both as to the velocity of the wind and the length of time it blew. But there is nothing to show that the said E. J. Stubbs knew anything of said warnings.

"The dredge Houston was one of the finest and staunchest boats of its kind that could be built for the work and in the waters for which it was designed and in which it was engaged at the time of its sinking, but it was not a seagoing dredge.

"Even if the said E. J. Stubbs had not been required by the superintendent and captain to work upon said dredge to save said dredge, and, as it may fairly be assumed, the lives of those thereon as well, after the actual work of dredging ceased, I find that said Stubbs, if he had attempted to leave said dredge at any time after noon of August 16, 1915, would reasonably have assumed a great risk of death by drowning in trying to reach land with the only means available at said dredge, and he reasonably could have expected to encounter by remaining on said dredge."

Upon these findings the court's conclusion of law was that Stubbs was an employé of the dredging company, and came to his death by accidental drowning, while actually engaged in the performance of his duties, and while acting in the course of his employment, entitling appellees to the benefits of our Workmen's Compensation Act. Articles 5246h to 5246zzzz, inclusive, Vernon's Sayles' Texas Civil Statutes; chapter 179, Acts 33d Leg.

As before noted, the suit was brought against the insurance company under that act to recover the compensation thereby prescribed, and was not a suit against an employer for damages for personal injuries resulting from alleged negligence. If it had been of the latter class, that is, if negligence had been the basis of the recovery sought, appellant's contention that it is not liable, because the death of appellees' decedent was the direct and proximate result of the immediate act of God, might have been meritorious, and the cases it cites applicable; but not so, we think, when applied to the character of suit here involved, that is, one under our Employer's Liability Act against the in-

surer upon a contract of insurance founded upon a wholly different theory of liability, that of compensation without any reference to negligence. The nature of that act is very succinctly stated by Chief Justice Phillips in Middleton v. Texas Power and Light Co. (Sup.) 185 S. W. 559, in these paragraphs:

"Its general purpose is to work an important change in the law in regard to the liability of employers for personal injuries to their employés, or for death resulting from such injuries, and the compensation afforded therefor to employés or their beneficiaries. * * *

"This compensation, fixed by the act on the basis of the employé's average weekly wages, accrues to him absolutely upon his suffering any personal injury in the course of his employment which incapacitates him from earning full wages for as long a period as one week, or to his representatives or beneficiaries in the event of his death from the injury, whether or not due to the negligence of the employer or any of his servants or agents. * * *

"Any employer of labor within the state, with the exceptions provided, may become a subscriber, and by complying with the act be, except as to exemplary damages just noted, exempt from all common-law or statutory liability on account of injuries suffered in his service by his employés," etc.

[2] It is thus seen that the benefits accrue absolutely upon the employé's suffering injury in the course of his employment; but appellant here answers that at the time of the fatal accident Stubbs was not acting in the course of his employment, that of an assistant engineer upon the dredgeboat, nor pursuing its duties, since no dredging was at that precise time being actually done, but had ceased to be so engaged some 14 hours before, and was then either attempting to protect himself or the dredge from violence of the storm; that he was employed as an engineer to do dredging work, and not for the purpose of protecting the dredge from the act of God.

In the face of the fact findings already recited it seems to us to be splitting hairs to say that Stubbs was not acting "in the course of his employment," for such is the exact language of our compensation statute. What does that expression mean? In the case of Larke v. John Hancock Mutual Life Insurance Company, 90 Conn. 303, 97 Atl. 320, L. R. A. 1916E, 584, the court says:

"An injury to an employé is said to arise in the course of his employment, when it occurs within the period of his employment, at a place where he may reasonably be, * * * or engaged in doing something incidental to it. 'In the course of' points to the place and circumstances under which the accident takes place, and the time when it occurred. Fitzgerald v. Manchester Liners, Ltd. [1910] A. C. 498, 500; McNicol's Case, 215 Mass. 497, 507, 102 N. E. 697, L. R. A. 1916A, 306; Bryant v. Fissell, 84 N. J. Law, 72, 86 Atl. 458, 460."

In Bischoff v. American Car Co., 190 Mich. 229, 233, 157 N. W. 34, 36, it is said:

"Of course, the scope of such particular employment may be enlarged for the time being by the direction of some superior who has authority; and in the case of an actual emergency it may be held that any reasonable attempt to preserve the employer's property is within the general lines of an employé's duty."

The rules stated in the cases quoted from, we think, relieve the case at bar from any difficulty in this respect. Stubbs was living upon the dredgeboat, and at all times under and subject to the orders of its captain, and the storm had not only created an emergency which required the efforts of all employés to keep it afloat, but had produced a situation permitting of nothing else; in other words, it was a Hobson's choice for those poor fellows so caught upon that boat, and Stubbs could have done nothing else than follow the primal instinct of self-preservation by helping to keep the boat above the seas.

[3] Since it was only necessary under the statute to find that the accident occurred "in the course of the employment," it may be that the court's further finding that the fatal accident "arose out of the employment" was unnecessary, but under the detailed facts shown here it certainly was not error. We think the Larke Case already quoted from, and the authorities it cites, makes this conclusion very clear.

In this connection it may be further said that this storm could not be said to have been either unprecedented or not within the reasonable contemplation of the parties in making the insurance contract here involved, because it was not only a matter of common knowledge, but the trial court found that other storms and hurricanes of great violence had visited Galveston Bay and its vicinity in the years of 1875, 1886, 1900, and 1909. The nature of the employment, the conditions under which it was to be and was pursued, the exposure to probable injury from reasonably to be expected storms of similar character were all matters incident to such a risk as was here underwritten, and therefore an injury maturing such a risk, we think, could well be said to have been incidental to and to have arisen out of that employment.

[4] Finally, having been thus knowingly and voluntarily entered into, this absolute and unqualified contract of insurance was not one the surety company was bound or compelled to make, nor did the law require any such duty or impose any such obligation upon it, wherefore it will not be permitted to excuse itself therefrom by pleading inevitable accident or the act of God. 1 Am. & Eng. Ency. Law, p. 588; 6 Ruling Case Law, p. 1001, par. 367; Northern Irr. Co. v. Dodd, 162 S. W. 948; Northern Irr. Co. v. Watkins, 183 S. W. 436.

Pursuant to the views expressed, appellant's first three assignments are overruled.

[5] The fourth and fifth assignments, relating to the amount of the compensation awarded, must be sustained. Instead of for $5,400, the judgment should have been for the amount of the matured weekly payments from the 17th day of August, 1915, up to

.the date of trial, on the 17th day of November, 1916, a period of 64 weeks, making a total of $815, together with interest thereon at the rate of 6 per cent. per annum from the date of entry of the judgment on November 18, 1916, and apportioned among appellees in the same manner as was the larger sum, and without prejudice to their right to bring suit for unmatured further installments. Accordingly, the trial court's judgment will be reformed so as to give appellees judgment for $815 in the manner and form just stated, and, as so reformed, will be affirmed. Article 5246kk, Vernon's Sayles' Texas Civil Statutes 1914; N. Y. Life Ins. Co. v. English, 70 S. W. 440, 442, 443; Jones et al. v. Dodd, 192 S. W. 1134, 1137, 1138; Racke v. Anheuser Busch Brewing Ass'n, 17 Tex. Civ. App. 167, 42 S. W. 774; Davidson v. Hirsh, 101 S. W. 269.

Reformed and affirmed.

### On Motion for Rehearing.

[6] In its motion for rehearing appellant has called our attention to the fact that, while our former judgment reduced the trial court's judgment against it from $5,400 to $815, the costs of the appeal were taxed against it. This should not have been, and our judgment will accordingly be here so modified as to tax the costs of this appeal against appellees instead of against appellant. But in all other respects, although the motion for rehearing has been carefully considered, we are unconvinced that any error has been committed, and our former judgment will be adhered to.

Granted in part, and in part refused.