## GALLAHER v. UNITED STATES FIDELITY & GUARANTY CO.

### No. 4285.

Court of Civil Appeals of Texas. Amarillo.

Nov. 26, 1934.

Rehearing Denied Dec. 10, 1934.

The case was tried to a jury, and in response to special issues they found that appellant lost his left foot as a result of the injury; that such injury was sustained in the course of his employer's business; that he was not carrying the gun solely for his own personal protection or personal pleasure or solely for shooting chicken hawks and coyotes; that he was not required by his employer to carry a shotgun.

The court rendered judgment that appellant take nothing by his suit upon the ground that as a matter of law the injury did not arise out of appellant's employment. He found that the appellant's average weekly wage was $27.66.

The first proposition is that because the evidence is sufficient to support the jury's findings that appellant's injury was sustained in the course of his employment and was of such kind and character as had to do with and originated in the work or business of his employer, the court erred in making a contrary finding and rendering judgment for appellee non obstante veredicto.

The appellee submits the counter proposition that because Gallaher had previously testified against his own interest to the effect that having the shotgun with him at the time of the injury had no connection with his work, but that he owned the gun for the purpose of shooting chicken hawks and coyotes, he was bound by such former testimony, even though he testified during the same trial that he had the gun for the purpose of protecting his employer's property. The insistence is that his former statement amounts to a judicial admission which is binding upon him, in the absence of some showing of mistake, oversight, misunderstanding, or lack of recollection, and because of his former contradictory statements, the court was justified in rendering a judgment notwithstanding the verdict.

The record discloses that while the appellant was upon the witness stand he testified that when he was in the hospital after the injury he signed a statement. He stated he was pretty sick at the time the statement was presented to him by one Meier, a claim agent for the insurance company. That Meier told him he was there to get the dope on the case or the facts as to how it happened, and asked him how he was getting along. That Meier told him he was a working-man himself and wanted to get the business straightened up so appellant could get his money, and that he (Meier) was ready to sign a draft for the money. That Meier commenced interrogating

L. B. Godwin and Kimbrough & Boyce, all of Amarillo, for appellant.

Gibson & Sutton, of Amarillo, for appellee.

HALL, Chief Justice.

Appellant filed this suit to set aside the action of the Industrial Accident Board denying him compensation under the Workmen's Compensation Law (Vernon's Ann. Civ. St. art. 8306 et seq.) for the loss of his left foot. It appears that he was wounded in his left foot by the accidental discharge of his shotgun.

him, wanting to know if there were any hawks on the lease, what appellant had the gun for, and if he ever shot any hawks. That Meier asked him if he was using the gun in connection with his work. He told him no. Several other questions were asked by Meier, who then left and came back with a statement copied on a typewriter and handed it to him to read. Appellant says he told him that it was not written the way he had told Meier and that he did not feel like fooling with him anyway, and further told him that he ought not to sign it in that way, and Meier said, "Well, it is just a matter of getting through with it quicker," and he signed it, Meier took it, and went away.

While on the stand he testified, in response to questions, that he carried the gun for other reasons than shooting chicken hawks and coyotes. That there had been a lot of stealing going on around there, and just a few days before that two fellows working on a Texas Company well not far away had some fellows come out while they were on the tower and took their money away from them and some other things that belonged to them there. That not long before that other fellows went over to the Danciger plant near Pampa and kidnapped some parties there and turned them loose pretty close to where he lived out close to Skellytown. That he had to go back over through the sand hills early in the morning about six miles and felt just a little better when he had the gun with him. That he frequently had to go out on the leases at night and carried his gun then. That he used the gun for any purpose he wanted to use it.

It appears from the record that the appellant's employer, the Texas Company, had two leases upon which there were producing wells. These leases were about six miles apart. The appellant lived in a house upon one of the leases. That he had a garden and raised chickens on the premises where he lived. That it was a part of his duties to keep the pumps running upon the leases and in the performance thereof visited the other lease about once a day. He said that he had the gun in his car so if he wanted to use it for anything —his own personal matter—that was what he used it for, or if he found anybody taking anything from the leases he would have been very glad he had the gun with him. That he put the gun in there on Saturday night before Sunday and before Monday. That he got hurt on Monday and did not use the car on Sunday.

In the written statement which he gave Meier he stated he was carrying his twelve-gauge shotgun which was loaded. That the gun had no connection whatever with his work. That he owned the gun for the purpose of shooting chicken hawks and coyotes in the vicinity of his residence. That as stated there was no reason for him to have taken the gun out on the job, as the Texas Company did not require him to carry fire arms in connection with the work he had to do for them.

He testified that he was on duty twenty-four hours per day, or was what was called a twenty-four hour man. Was required to pump a certain amount of oil each day from the wells on both leases, which did not require all of his time. That he used his own automobile transporting himself, tools, and equipment from one lease to the other. That it was part of his duty to clean the storage tanks on the leases when they became soiled or dirty; that the tanks were painted with aluminum paint, and the company furnished him with rags, cotton waste, and kerosene for cleaning purposes. That the leases are a considerable distance from any settlement or town. That he and his wife were the sole occupants of the lease upon which they resided. That he planted and cultivated a garden and raised chickens for his own use, but there were many predatory birds and animals in the vicinity of the lease which preyed upon his garden and chickens; that the company knew that he had planted a garden and was raising chickens and acquiesced in his doing so. At the time of the accident, he testified that he took the rags and kerosene and went to the tanks, wiped off the oil, but did not get the tank as clean as he thought it should be; that he had more rags in the car and went back to get them to finish wiping the tanks. That when he walked up to the car and opened the door, he had some rags on the car seat to keep from getting the seat dirty, and when he reached over to get the rags, in some way the shotgun slipped out of the car door, fell down across the running board, and was discharged, shooting him in the left foot and ankle. That he put the gun in the car Saturday afternoon when his wife called his attention to the fact that she saw a light down on the lease near one of the wells. That he put the gun in the car and drove down to the well. That he had orders to take care of and watch the movable property on the leases, as a lot of stuff had been stolen in that vicinity and some belts had been lost. That he had been ordered, if he had any going to town to do, to go in the daytime and try to stay on the leases at night to

protect the property. That his left foot was amputated as the result of the accident. He testified further he had been carrying the gun for about a year and a half while he had been looking after the two leases. That he had shot chicken hawks with it and shot at coyotes. They were both bothering his chickens. That one coyote had caught four of his chickens at one time and hawks were frequently diving down and catching them. That he wanted the gun for his protection and to prevent any one from taking property off of the leases.

The wife of appellant testified that on one occasion she was on the back porch after sundown and saw a light near one of the oil wells, probably 300 yards away. That she went into the house and told appellant. That he took his gun, got in the car, and drove down to the well and drove all around it. That when he came back he did not bring the gun into the house.

D. J. Gribbon, district superintendent of the Texas Company, testified that he expected the appellant, if he saw anybody taking any of the property belonging to the company, to act on his own judgment and to go as far as the witness would go in doing so. That witness would have protected the property against thievery. That it was important to have a man living on the lease, because such property as belts had been stolen. That he had marked other belts in order that he might know them and the fact that there was a man living on the lease would serve to keep thieves away.

■ If there are any inconsistencies or contradictions between the statement which appellant made while he was in the hospital and his subsequent testimony upon the stand, they simply present a conflict which it was the prerogative of the jury to settle. It is not such a judicial admission as would warrant the court in instructing a verdict against appellant or in entering judgment notwithstanding the verdict.

In the case of Herd v. Wade (Tex. Civ. App.) 63 S. W. (2d) 253, 257, the same contention was made and contradictory statements made by Mrs. Wade were urged as a basis for the court's action. From her former testimony, a stenographic report taken at a previous trial was read. In disposing of the contention, we said: "If it be admitted that she had made inconsistent statements and that her positive testimony on a former trial was in conflict with her testimony upon this trial, nevertheless the court would not have been justified in directing a verdict. The credibility of a party who testifies is for the consideration of the jury, though he has made contradictory statements, for the jury may believe one part of a party's testimony and refuse to believe another."

In addition to the authorities there cited, the same rule is announced in Katz v. Nix (Tex. Civ. App.) 42 S. W. (2d) 801; Williams v. National Bank of Commerce (Tex. Civ. App.) 62 S. W. (2d) 1108, and authorities cited; Daggett v. Corn (Tex. Civ. App.) 54 S. W. (2d) 1098.

■ The second proposition is that the jury having found that appellant had lost his left foot as the result of an injury sustained by him in the course of his employment and a finding of the court that appellant's average weekly wage was $27.66, both findings being supported by the evidence, the court erred in not rendering judgment for appellant for 125 weeks' compensation at the rate of $16.59 per week.

The appellee company meets this contention with the proposition that an injury to an employee, brought about solely by a dangerous instrumentality injected into the employment by the employee himself, not provided for in the contract of employment and which could not be said to have been reasonably anticipated by the employer, or not reasonably necessary to the carrying out of the employment, is not compensable under the Workmen's Compensation Act of Texas.

This is not a correct statement of the law applicable to the facts of this case. In this connection appellee further contends that the evidence shows as a matter of law that appellant's injury did not grow out of his employment and the appellee was entitled to a peremptory instruction in its favor. We cannot assent to this proposition.

■ It is stated that an accident arises in the course of and out of the employment when it occurs within the period of the employment at a place where the employee reasonably may be in the performance of his duty and while he is fulfilling that duty or engaged in doing something incidental thereto. U. S. Casualty Co. v. Hardie (Tex. Com. App.) 299 S. W. 871; Petroleum Casualty Co. v. Green (Tex. Civ. App.) 11 S.W.(2d) 388; Federal Surety Co. v. Ragle (Tex. Com. App.) 40 S.W.(2d) 63.

■ At the time the gun slipped out of the car, appellant was engaged in cleaning the outside of one of the oil tanks and had opened the door of the car, and in pulling out some rags or waste to be used in the performance

of his duties, the gun slipped out of the car, falling on the running board, and was accidentally discharged, resulting in his injuries. An injury to an employee is said to arise in the course of his employment when it occurs within the period of his employment at a place where he may reasonably be at that time or when engaged in doing something incidental to it. Southern Surety Co. v. Stubbs (Tex. Civ. App.) 199 S. W. 343. The evidence is undisputed that he was injured within the period of his employment and while at work, and it cannot be successfully contended that the injury did not arise in the course of his employment, because, as held in the Stubbs Case, "in the course of" points to the place and circumstances under which the accident takes place and at the time when it occurred.

In the case of Lumberman's Reciprocal Association v. Behnken, 112 Tex. 103, 246 S. W. 72, 73, 28 A. L. R. 1402, Judge Greenwood said: "An injury has to do with, and arises out of, the work or business of the employer, when it results from a risk or hazard which is necessarily or ordinarily or reasonably inherent in or incident to the conduct of such work or business. As tersely put by the Supreme Court of Iowa: 'what the law intends is to protect the employee against the risk or hazard taken in order to perform the master's task.'—Pace v. Appanoose County, 184 Iowa, 498, 168 N. W. 916, 918. Though injuries arising from risks incidental to employment most frequently occur during hours of active labor and on premises within the control of the employer, yet they are not always so circumscribed either as to time or place." (Citing authorities).

We think the testimony is sufficient to sustain the jury's finding that the injury was sustained in the course of his employer's business. The evidence shows that he and his wife lived in a sparsely settled district, several miles from any town or community center. That he was charged with pumping a certain amount of oil each day from wells situated upon two different leases about six miles apart. That robberies had been committed in that vicinity and belts and other movable property stolen from the two leases, that one party had been kidnapped, and that he frequently had to perform a part of his duties after sundown. It is common knowledge that the whole country is flooded with crime and that crime conditions are aggravated in oil districts which, without exception, become the rendezvous for criminals of the worst class. Under such circumstances he would have acted unwisely in attempting to protect his employer's property without arming himself, and his fear of meeting with such characters was not unreasonable. Situated as he was, charged with the responsibility of protecting valuable property, we think the possession of the shotgun was incidental to the performance of his duties, as he was subjected to risks and hazards not reasonably inherent in the performance of such duties in more favorable localities.

It is held in United States Casualty Co. v. Hampton (Tex. Civ. App.) 293 S. W. 260, that the words "out of" point to the origin and cause of the accident or injury; the words "in course of" to the time, place, and circumstances under which the accident or injury takes place. The character or quality of the accident as conveyed by the words "out of" involves the idea that the accident is in some sense due to the employment. It must result from a risk reasonably incident to the employment. As we understand the decisions, the risk is not limited to the personal safety of the employee, but if his work is such as to isolate him and place him where it becomes necessary for him to protect his property, whether it be vegetables or chickens or other property, from predatory animals and birds, the possession of firearms for that purpose would be incidental to the performance of his duties. The rule announced in the Behnken Case, supra, has been followed in numerous cases in this state. McClure v. Georgia Casualty Co. (Tex. Com. App.) 251 S. W. 800, Standard Accident Insurance Co. v. Stanaland (Tex. Civ. App.) 285 S. W. 878, Indemnity Ins. Co. of North America v. Scott (Tex. Com. App.) 298 S. W. 414, in which it is held that a compensable injury sustained in the course of employment is one which had to do with and originated in the work, business, trade, or profession of the employer and which was received by the employee while engaged in or about the furtherance of the affairs or business of his employer.

Appellant may have been guilty of contributory negligence to some extent in leaving the gun in the car for two days and nights and at the time the gun slipped out of the car, but, of course, contributory negligence is not a defense in actions of this character. The rights of the appellant depend upon the reasonableness under all the circumstances of his action in having the gun with him on Saturday night before he was injured on Monday, when he drove from his house down to the well for the purpose of ascertaining the significance of the light

which his wife reported she saw at that place. It cannot be reasonably contended that he did not act with good sound judgment in arming himself before driving down to the well.

The testimony of the company's officials is sufficient to show that Gallaher was in a sense a watchman upon the two leases, as well as a pumper. No orders had been issued preventing him from carrying firearms, and the evidence indicates that the company rather expected him to arm himself if necessary to protect the property. The presence of criminals and their thievery, hijacking, and robbery in that vicinity and upon the leases tended to create an apprehension of danger and suggested a hazard which might have been in the contemplation of any reasonable person in employing or accepting employment as incidental to it.

 "A risk may be incidental * * * when it is either an ordinary risk directly connected with the employment, or an extraordinary risk which is only indirectly connected with the employment owing to the special nature of the employment." Bryant v. Fissell, 84 N. J. Law, 72, 86 A. 458, 461.

 The appellant testified that he frequently used the gun in shooting rabbits and birds as a pastime while driving from one lease to another and while not actually engaged and at work. This would not affect his relation nor his right to recover, because he was injured on one of the leases while actually performing his prescribed duties.

An automobile salesman was killed while attempting to sell an automobile to a prospective customer. He had spent the day trying to make the sale, and at night the prospect suggested that he would like to load the car with passengers and drive it himself to see how it handled. Incidentally they decided to go to a dance, if they found one at a neighboring town. The salesman was held to be engaged in his master's business, the personal pleasure being only incidental to the paramount purpose of selling the car, and the employer was held liable for compensation. Ford Motor Co. v. Ind. Com., 64 Utah, 425, 231 P. 432.

In Northwestern Iron Co. v. Ind. Com., 160 Wis. 633, 152 N. W. 416, 417, it appears that an employee was injured by being crushed between two cars. The evidence was conflicting as to whether claimant was, during the intermission between the loading of cars, picking up briquettes, which was part of his duties, or warming himself from the heat emanating from the hot briquettes in the car next to which he had been lying. The Commission awarded compensation on the theory that it was immaterial which conclusion was reached, saying: "The man's duties involved periods of leisure during which apparently he was expected to kill time as best he might, with no specific direction as to what he should do or where he should wait; the night was cold, and he put off dumping the car until he could warm himself from its heated contents; to say that in so doing he had left the master's employment, was pursuing his own private purposes, and doing something foreign to the work he was employed to do is illogical to a degree."

In line with this view is the holding in the case of Southern Surety Co. v. Shook (Tex. Civ. App.) 44 S.W.(2d) 425, 427. Briefly stated, the facts are in that case that Shook was a pumper on an oil lease. His duties did not require a constant attendance at the well or at the shack where he resided. He kept some hunting dogs which was known to his employer and one night three boys started hunting. They conceived the idea of robbing Shook and murdering him "just to see him kick." They lured Shook and his brother from their shack, to go on a pretended wolf hunt, and when about half a mile from the lease, both of the Shooks were murdered. In a suit by the mother and her other children to recover under the Workmen's Compensation Law, Judge Hickman of the Eastland Court said:

"Did Lucien Shook's injuries result from a hazard reasonably inherent in or incident to the conduct of his work as pumper? We think they did. By the terms of his employment, he was on duty twenty-four hours each day, and was housed in a shack belonging to the employer and erected near the pump in order that he might be available for duty at all times. It would doubtless not be questioned that he was on duty while asleep, or while eating, or tending to other necessary wants. When a man is employed to work at any job, the fact that he is a human, with ordinary human habits and requirements, is necessarily taken into consideration. Had the murder occurred while the employee was providing water or fuel for his own comfort, no question could be made that he was then in the course of his employment in furthering the master's business. The evidence discloses that he was murdered near a tank on an adjoining tract of land. Had he gone to that tank to take a bath or procure water for his use in the shack and been murdered

318

while there, he would clearly have been at the time of his death in the course of his employment. The question is: Was he in the course of his employment while hunting near the premises or indulging in other forms of recreation and diversion? The case is the same as if he had been murdered while playing croquet. The employer knew that he hunted and played croquet as means of exercise and diversion. It is a matter of universal knowledge that a certain amount of recreation is not only desirable, but absolutely necessary to one's well being and to the proper discharge of his duties. The pump could be heard for more than a mile away, and the hunting trip was to be for only a half mile. We can see no valid or just reason for holding that there is any substantial difference, with relation to the question of whether the employee was in the course of his employment, between an injury received while engaging in necessary diversion known and permitted by the employer and one received while the employee is sleeping or tending to any other necessary duty common to mankind.

"The Workmen's Compensation Law should not be hedged about with strict construction, but should be given a liberal construction to carry out its evident purpose. It would be a narrow and very strict construction that would require a pumper to sit by his pump at all times in order to claim protection as an employee. He was only required, under this law, to carry on the business of his master, and much latitude was allowed him because of the very nature of his work."

Both appellant and appellee state that the case has been fully developed and that nothing new could be added in the way of pleading or evidence upon another trial. They both request that the case be considered upon its merits and that this court render such judgment as should have been rendered in the court below, and this seems to be the proper method in cases where a judgment non obstante veredicto has been appealed from. Smith v. El Paso & N. E. Ry. Co. (Tex. Civ. App.) 67 S.W.(2d) 362.

We believe that the court erred and that judgment should have been rendered in accordance with the verdict. The judgment is therefore reversed and is here rendered that appellant recover the sum of $16.59 per week for a period of 125 weeks.

Reversed and rendered.