262 F.2d 142
 Mrs. Jewel Franklin ENGLISH, a widow, individually and as
next friend for her minor children, Frank Hugh
English and Brenda Lou English, Appellant,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY, Appellee.
 No. 17232.
 United States Court of Appeals Fifth Circuit.
 Dec. 30, 1958.
 
 Kenneth C. Spell, Jr., Wichita Falls, Tex., Mock & Spell, Wichita Falls, Tex., for appellants.
 H. W. Fillmore, Roy Schaeffer, Wichita Falls, Tex., Bullington, Humphrey, Humphrey & Fillmore, Wichita Falls, Tex., for appellee.
 Before HUTCHESON, Chief Judge, and RIVES and WISDOM, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 This is a Texas workmen's compensation case, in which at the close of the evidence the district court directed a verdict for the defendant insurance carrier on the ground that the injury to and death of plaintiff's husband did not arise out of and in the course of his employment.
 
 
 2
 Jewel Franklin English, now deceased, was employed by the insured Brownie's Well Service to service oil wells, working on pulling machines and spudders in and around Goree, Texas. He lived near his work. His employer furnished him with a pickup truck which he brought home with him in the evenings and which he drove to the employer's yard at Goree each morning, leaving his home around 7:30 A.M.
 
 
 3
 On the morning of November 9, 1957, Mr. English, the deceased, was having trouble with the pick-up assigned to him, but after getting it started at his home, he drove to his foreman's house and the two of them went directly to the employer's yard in separate pick-ups. They arrived a few minutes before 8:00 A.M. Upon arrival at the yard, they began transferring tools and a butane hose from English's pick-up to the foreman's pick-up. During the process, English dropped a shotgun which he had been carrying in his truck. The shotgun accidentally discharged and killed English almost instantaneously.
 
 
 4
 The District Judge explained his reasons for directing a verdict for the defendant as follows:
 
 
 5
 'The Court: This is an unusual case. I do not think that it is governed conclusively by the Gallaher case or the Burnett case or the Bailey case, although there are some resemblances. But, after all, the evidence here gives a different factual complexion in various ways from those cases and any other case that has come to my knowledge.
 
 
 6
 'I think on principle, though, that the record here is too tenuous to raise an issue of fact and sustain a findings that the deceased was injured fatally as the result of a hazard having to do with and originating in the work or business of his employer.
 
 
 7
 'The evidence does show that snakes are seen at times in the general section of the state where the deceased was employed, that is, some rattlesnakes and copperheads, but I think it would require simply conjecture or guess work to say that the deceased had this shotgun for selfprotection against snakes in the course of his work, particularly so on the very day of his fatal injury. The proof is not that he bought the shotgun for the known purpose of protecting himself against the snakes, but, on the contrary, it was a present from his wife.
 
 
 8
 'There is no testimony that he ever used the shotgun to shoot snakes while he was on the job; and, on the other hand, there is testimony that he used it with some frequency in hunting after work hours.
 
 
 9
 'The testimony is clear that he was not required to have the shotgun as any facility in connection with his work. The testimony is also that on this day in question he and his fellow workman, Case, intended to move one of their employer's rigs from the Hobart lease, which was a cultivated tract of land, where, according to the witness Case, there had been no snakes seen, to a well on the Canterberry lease near or at the edge of the town of Goree, and there was testimony that snakes were seen at time in or near Goree. The witness Case had never used a shotgun to deal with snakes. The testimony is that the deceased never told his employer that he wanted a shotgun or thought it was necessary to have a shotgun to use as protection against snakes on leases where his employer might have work to do.
 
 
 10
 'In other words, it seems to me it would be too much of a stretch of the record here to surmise that he had this shotgun to shoot snakes with-- no testimony that he ever made such use of the shotgun-- rather than just having it simply as a shooting arm for hunting game.
 
 
 11
 'I do not think the record would support an inference in the first direction even as well as it would an inference in the other direction, and, at any rate, that it is weighted in too much uncertainty to say that the testimony introduced by the plaintiff here would or could in law be sufficient to discharge the burden of proof resting on the plaintiff to the extent of making an issue of fact.
 
 
 12
 'I conclude that, as a matter of law, the proof in the record is not tangible and clear enough to support a finding in favor of the plaintiff.
 
 
 13
 'This means, gentlemen of the jury, that in this instance the Court is taking the responsibility for the decision of this case, which is the proper authority of the Court when it appears that a certain disposition is indicated as a matter of law.
 
 
 14
 'Mr. Marshal, hand the verdict sheet there and let this gentleman on the end sign it.
 
 
 15
 '(Juror complies.)'
 
 
 16
 It appears from the record that the statements which we have italicized in the foregoing quotation from the District Judge are not accurate. Mrs. English testified to several occasions when her husband had used the shotgun to kill snakes. Mr. Case, the foreman, testified:
 
 
 17
 'Q. During the period of time that you all worked together, did you ever have occasion to see him use the shotgun on the job for any reason? A. Yes, sir.
 
 
 18
 'Q. What did you see him do? A. Well, I have saw him kill snakes with it a time or two.
 
 
 19
 'Q. Do you remember where you were when that happened? A. The only time it ever happened would be on the Golden lease. He killed--
 
 
 20
 'Q. On the Golden, did you say? A. Yes, sir.
 
 
 21
 'Q. That lease is where? A. It's about three and a half miles southeast of Goree.
 
 
 22
 'Q. In your work in that general area, Clifford, whenever you were with Jewel or not, did you ever see any snakes out on those leases where you worked? A. Yes, sir.
 
 
 23
 'Q. What kind of snakes did you see? A. Well, copperheads, the two what we shot.
 
 
 24
 'Q. You were going to go from the yard there over to the Hobart lease and move that machine to the Canterberry well there in the town site of Goree? A. Yes, sir.
 
 
 25
 'Q. Now, you had been around and on the Hobart lease a good deal? A. Yes, sir.
 
 
 26
 'Q. Had you ever seen a snake on there? A. No, sir.
 
 
 27
 'Q. Had you been around the Canterberry well any? A. Yes, sir.
 
 
 28
 'Q. Had you ever seen a snake around it? A. Yes, sir.
 
 
 29
 'Q. Around the Canterberry well there in the town site of Goree? A. Not right at the well but just a short distance from there.
 
 
 30
 'Q. How many snakes had you seen around there? A. Well, one that I can remember.
 
 
 31
 'Q. Is some of that country pretty rough country? A. Yes, sir.
 
 
 32
 'Q. Have you ever had occasion to see any snakes around any equipment that you all left out on the lease? A. Yes.
 
 
 33
 'Q. Where did you see them? A. That was where he killed the snakes on the Golden lease.
 
 
 34
 'Q. Well, did they come out from under the equipment or did they come from somewhere else, or could you tell? A. Well, I couldn't tell. Just found them out there when we was working out.'
 
 
 35
 The work on the Canterberry well was to be done for a Mr. William Clyde Morton. Mr. Morton testified:
 
 
 36
 'Q. Did you ever see any snakes out in those fields where you worked? A. Yes, sir.
 
 
 37
 'Q. What kind of snakes did you see? A. Well, I have seen rattlesnakes, bullsnakes, prairie racers.
 
 
 38
 'Q. What poisonous snakes? A. Rattlesnakes is about the only poisonous snake we have that you see much of.
 
 
 39
 'Q. Are there quite a few or just several? A. Well, there is several.
 
 
 40
 'Q. Now, did you ever see any snakes right there by the well site that they were coming to work on? A. Well, I haven't. I haven't saw one but there was one killed there just a while before, right there at that house where this well where they was coming to work; and another one was in the grass, and he didn't see him, and he got away.
 
 
 41
 'Q. Were there any other killed around that general period of time right in the town of Goree? A. Yes, sir.
 
 
 42
 'Q. Where? A. One killed right by-- well, let's see, it was a while before that, though, when that one was killed there at the theater, right there by where you step up on the sidewalk at the theater, and right in town in Goree. And there were two killed in the nigger shacks down there kind of southwest just a little bit of where this well is. There was two killed there and there was one got away from a feller right across, just a block across from where I lived, right up in the main part of town. And then there was another one killed up in the southwest part of town.
 
 
 43
 'Q. All right. Now, Mr. Morton, when you go out on your wells do you ever carry a gun? A. Well, no, I haven't.
 
 
 44
 'Q. Are you generally familiar with a lot of the pumpers and the people that work the oil fields, those leases and all, right around Goree? A. Well, fairly well, yah.
 
 
 45
 'Q. Do you know whether or not many of those pumpers carry shotguns or weapons with them when they are out working those leases? A. Some of them do and some of them don't, on account of the leases where the well is at, they are not allowed to carry guns on those leases, and some of them do.'
 
 
 46
 Odell Brown, the employee of the deceased, testified:
 
 
 47
 'Q. And during the period of time that we are referring to, when you went out on those wells did you ever have an occasion to see any snakes around the wells? A. Yes, sir.
 
 
 48
 'Q. Did you ever kill a snake? A. No, sir, I don't believe I have.
 
 
 49
 'Q. Did you ever see anyone else kill one? A. I have seen some of the boys kill some.
 
 
 50
 'Q. Who? A. I have seen Jewel kill two in two particular different times.
 
 
 51
 'Q. Now, Mr. Brown, you were asked if Jewel or Clifford, either one, ever requested permission to carry a gun. Had Jewel done so, what would have been your answer? A. That would have been entirely up to him.
 
 
 52
 'Q. In other words, if he felt it was necessary to carry a gun, it would have been perfectly all right with you? A. He could have carried four if he wanted to; I didn't care.
 
 
 53
 'Q. And if there were snakes out on that job, or any job that he worked on, and he felt like a shotgun was necessary, it was certainly all right with you for him to carry it, wasn't it? A. Yes, sir.'
 
 
 54
 If the deceased carried the shotgun simply for hunting, for his personal pleasure, we would agree with the District Judge that, under the Texas law generally and under the cases to which the District Judge referred,[1] it could not be said that the injuries had to do with or originated in the work or business of the employer. We think, however, that there was substantial evidence from which the jury might have found that the deceased carried the shotgun for a purpose incident to his employment. The issue was for the jury, and the court erred in directing the verdict. The judgment is therefore reversed and the cause remanded.
 
 
 55
 Reversed and remanded.
 
 
 
 [1]
 Gallaher v. United States Fidelity & Guaranty Co., Tex.Civ.App.1934, 77 S.W.2d 312; Aetna Life Ins. Co. v. Burnett, Tex.Com.App.1926, 283 S.W. 783; Texas Employers' Insurance Ass'n v. Bailey, Tex.Civ.App.1924, 266 S.W. 192