PAULINA YOUNG, Appellee, v. MISSISSIPPI RIVER POWER COMPANY, Appellant.

**MASTER AND SERVANT:** Workmen's Compensation Act. A servant may be acting "*in the course of his employment,*" and an injury to him may be one "*arising out of his employment,*" even though, when he is so acting, and when he is so injured, he is technically outside the *precise* scope of his employment, by reason of the fact that a sudden and unlooked-for danger menaces his master's property. So held where the engineer of a pumping station attempted to remedy an unanticipated break in the crossarm on a pole carrying electricity.

*Appeal from Lee District Court.*—HENRY BANK, JR., Judge.

JANUARY 11, 1921.

REHEARING DENIED MAY 10, 1921.

FROM a judgment of the district court confirming an award in plaintiff's favor under the Workmen's Compensation Act the

defendant appeals. The material facts are stated in the opinion.
—*Affirmed.*

*George B. Stewart* and *J. O. Boyd,* for appellant.

*E. C. Weber* and *John L. Benbow,* for appellee.

WEAVER, J.—The defendant is a corporation, owning and operating an extensive plant for the production and distribution of electric power at Keokuk, Iowa. From its dam it maintains various transmission lines, one or more of which extends from its central station to the town of Fort Madison, a distance of 24 miles. At Fort Madison pumps are installed, operated by electric power, to lift surface water collecting there over the levee into the river. The transmission line carries 11,000 volts of electricity from which about 440 volts are diverted by the use of a transformer for the operation of the pumps.

In December, 1914, John D. Young, a married man, 34 years old, was, and for a year or more had been, in the employment of the defendant company, as engineer of the pumping station. To use the language of the defendant's witnesses, Young had full control of the station, and could cut off the power by turning the switch. At the date named, defendant had for some time been engaged in preparing for the installation of a new transformer at this station. On December 8th, Young, by telephone, called up the Keokuk office, and reported to the superintendent that the transformer had arrived at the railway station. In response, he was directed to secure a drayman to do the hauling. The superintendent, as a witness, further states that, in addition to instructions regarding the employment of a drayman, he told Young that he (witness) would come to Fort Madison in the afternoon, and "oversee the handling" of the transformer. Young did engage a drayman; and, without waiting for the arrival of the superintendent, they went to the railway station, where they loaded the transformer on the dray and drove to the place where it was to be lifted to a platform prepared for it. Having arrived there, they undertook to unload it. As near as we can gather from the record, they drove the dray to the foot of the derrick or framework on which it was

intended to place the transformer. They there arranged a block and tackle, suspended from the crossarm of one of the poles on which the transmission wires were strung, and with it proceeded to lift the transformer from the dray, intending, when they had the load thus suspended, to drive the dray out from under it. Whether it was their purpose to hoist the transformer to its resting place on the framework or to deposit it on the ground does not appear. At some stage of the lifting, not definitely mentioned, the crossarm bearing the load broke. It was not completely severed, but the broken end, carrying the wires, dropped or sagged below its proper position. The drayman, the only living witness, says that thereupon Young ''went up to fix the crossarm and straighten it up,'' and that ''he got a little too close to the electric power, and fell from the wires to the ground.'' He was instantly killed.

Proceedings for an award of compensation were instituted, on behalf of the widow and family. The defendants resisted the demand, on the ground that the deceased was intoxicated at the time of receiving the fatal shock, and thereby brought about his own death; and that the injury suffered by him did not arise out of or in the course of his employment. The board of arbitrators found against the defendant on each of the issues tendered. That finding was confirmed by the state industrial commissioner, and on appeal to the district court, it was again sustained.

While there is testimony in the record tending to show that the deceased had drunk intoxicants to some extent on the day of his death, it falls far short of that measure of proof which would justify a finding that he was drunk, or incapable of attending to his usual duties in a reasonably careful and efficient manner. Indeed, the conclusiveness of the commissioner's finding upon this branch of the case does not seem to be seriously contested on this appeal. The proposition most strenuously contended for by counsel for appellant is that the injury resulting in the death of deceased did not arise out of or in the course of his employment. It is said that the employment and duties of the deceased were strictly confined and limited to his work as engineer of the pumping station; that he was charged with no duty or authority to make repairs or remedy breaks or defects

in the wires carrying the electric current; that, in attempting to repair or restore the broken crossarm, he was acting as a mere volunteer, wholly outside of the scope of his employment; and that his death in so doing imposes no liability on his employer.

If there are precedents going to the extent of the appellant's claim in this respect, we are quite sure that they have never been followed by this court, and we regard them as unsound in principle and contrary to the spirit and intent of our statute. Generally speaking, the employer of labor rightfully expects from his employee something of a spirit of loyalty, and a reasonable degree of care for the protection of the employer's property in or about which his services are engaged. The hired servant is something more than a mere machine or automaton, and he brings to the service of the hirer not merely a pair of hands, but hands plus brains and conscience, which will forbid an honest employee to stand idly by, refusing to interpose the slightest effort to save his employer from irreparable injury or loss, for no better reason than that the strict letter of his contract does not require such action on his part. Such terms are rarely, if ever, expressed in the words of the agreement between employer and employee; but it is at least what, for want of a better term, we may call a moral implication in every contract of hire, and the employee, no matter what may be his rank or station or what may be the prescribed limit or range of his ordinary duties who discovers imminent peril or calamity threatening his employer, in person or property, and, without stopping to debate with himself whether he will respond to the emergent call upon his manhood, at once hastens to avert the damage as best he may, is not a mere intermeddler or volunteer, and the injury to which he thus exposes himself arises out of and in the course of his employment, within the meaning of the statute; and that, too, even though, in the stress of the emergency, he disregards some of the general rules prescribed for the control of his conduct under normal conditions.

Without extending this opinion to quote largely from the authorities, we cite the following, in which the conclusion we here announce is distinctly upheld: *Harding v. Brynddu Colliery Co.*, 2 K. B. (1911) 747; *Matthews v. Bedworth Tile & Timber Co.*, 1 W. C. C. 124; *Frint Motor Car Co. v. Industrial*

*Commission,* 168 Wis. 436 (170 N. W. 285) ; *Dragovich v. Iroquis Iron Co.,* 269 Ill. 478 (109 N. E. 999) ; *State v. District Court,* 129 Minn. 176 (151 N. W. 912) ; *United States F. & G. Co. v. Industrial Acc. Commission,* 174 Cal. 616 (163 Pac. 1013) ; *Northern Ind. G. & E. Co. v. Pietzvak,* (Ind. App.) 118 N. E. 132; *General Acc. F. & L. A. Corp. v. Evans,* (Tex. Civ. App.) 201 S. W. 705; *Southern Surety Co. v. Stubbs,* (Tex. Civ. App.) 199 S. W. 343; *Rzepczynski v. Manhattan Brass Co.,* 165 N. Y. Supp. 1110.

The general doctrine is well summed up in the case of *London and E. S. Co. v. Brown,* 7 Sc. Sess. (5th Ser.) 488, where Lord Justice-Clerk says:

"I cannot doubt that, in a sudden emergency where there is danger, a workman does not go out of his employment if he endeavors to prevent the danger from taking effect."

The facts in the case now before us bring it clearly within the rule of the cited cases. Young was charged with the duty to attend the operation of the pumps by use of the electric power transmitted over these wires. He was doing work for and in the interest of the defendant when the crossarm broke, disturbing the wires and causing them to drop or sag. They were charged with a deadly current. The break in the arm and the resulting disturbance of the wires must have at once impressed him with the possibility of grave danger from that source, both to life and property. That he should act at once and investigate the broken appliance, with a view to preventing such harm, is not strange; and even though what he did may not have been the wisest expedient which could have been adopted, it detracts nothing from the merit of the plaintiff's claim for compensation. His negligence, if any, is not available to the appellant as a defense, or as affecting his measure of recovery.

The finding by the commissioner and its approval by the trial court have ample support in the evidence, and must be accepted as final.

The judgment of the district court is affirmed, with interest from the date of its rendition.—*Affirmed.*

Evans, C. J., Preston and De Graff, JJ., concur.